AMMEX, INC., Plaintiff,

v.

**THE UNITED STATES, Defendant.**

Nos. 99–338T, 99–778T.

United States Court of Federal Claims.

April 10, 2002.

J. William Koegel, Jr., Washington, D.C., attorney of record for plaintiff.

William K. Drew, Washington, D.C., with whom was Eileen J. O'Conner, Assistant Attorney General, for defendant.

## OPINION

### REGINALD W. GIBSON, Senior Judge.

This case is before the court on cross-motions for summary judgment.[1] The plaintiff, Ammex, is seeking a refund of federal excise taxes, aggregating $6,090,975, that it allegedly paid when it purchased gasoline and diesel fuel for resale at its duty-free facility from 1994 through 1998.[2] In its motion, defendant contends that Ammex lacks standing to claim a federal excise tax refund under—the Export Clause of the U.S. Constitution; the general provisions of the Internal Revenue Code; and/or 26 U.S.C. §§ 4221, 6416, 6421 and 6427.[3] Conversely, on cross-motion, Ammex maintains that by virtue of its classification as a *sterile duty-free* enterprise, it was an exporter of gasoline and diesel fuel, and thereby is entitled to a refund of federal excise taxes notwithstanding its contractual inability to purchase said fuel tax-free. For the reasons set forth below, defendant's motion for summary judgment is granted in part and denied in part, and plaintiff's cross-motion for summary judgment is denied.

## JURISDICTION

This court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), to hear claims against the United States that are founded upon the Constitution and/or any act of Congress.

## FACTUAL BACKGROUND

### Location

Ammex is a "sterile duty-free" enterprise located at 3400 West Lafayette, Detroit, Michigan. It is situated beyond the U.S. Customs exit point (point-of-no-return), within two miles of the Canadian border, at the Ambassador Bridge.[4] The Ammex facility is considered "sterile" because it is configured in such a way that anyone entering the facility *must* depart the United States via the Ambassador Bridge and enter into Canada. A key irrefutable fact, here at bar, is that entry *and* exit of *all* motor vehicles into and from Ammex's facility is *regulated and controlled by U.S. Customs.*

### Customs' Classification

Ammex sells at retail various *duty-free goods,* including, but not limited to, liquors, wines, cigarettes, watches, gold jewelry, perfumes, toiletries and seasonal gift items. It also sells at retail gasoline and diesel fuel. The U.S. Customs Service Detroit branch granted Ammex tentative approval to operate as a sterile duty-free store on *December 23, 1993,* prior to the tax quarters in issue. That tentative approval, however, excluded the sale of gasoline and diesel fuel. Ammex promptly entreated U.S. Customs officials to "reconsider" the exclusion of a "bonded petroleum product operation."[5] The district director of the Customs branch in Detroit responded by memorandum, dated March 23, 1994, seeking an internal ruling from the Commercial Rulings Division in Washington, D.C. Notwithstanding the pending internal

---

1. Defendant filed a motion for summary judgment on October 13, 2000. Ammex followed with its cross-motion for summary judgment on December 5, 2000.

2. Ammex filed a complaint for the quarterly tax periods ending June 30, 1994 through September 30, 1996, on May 29, 1999 (*Ammex, Inc. v. United States,* Fed.Cl. No. 99–338 T). Thereafter, on September 23, 1999, plaintiff filed a second complaint for the quarterly tax periods ending December 31, 1996 through December 31, 1998 (*Ammex, Inc. v. United States,* Fed.Cl. No. 99–778 T). The latter case was consolidated with the former case on December 2, 1999.

3. In its complaint, plaintiff alleged that under 26 U.S.C. §§ 4221, 6416, 6421, 6427 and other relevant provisions, it is: (a) the person who paid the excise taxes on the gasoline and diesel fuel that was exported; (b) a wholesaler of such gasoline and diesel fuel; and/or (c) the ultimate purchaser of the gasoline and diesel fuel.

4. The Ambassador Bridge is a primary crossing-point between the United States and Canada.

5. Letter from Ammex dated December 23, 1993, addressed to the District Director of Customs, Detroit, Michigan.

ruling, the Detroit branch issued its final approval of Ammex's classification as a "sterile duty-free operation," on April 6, 1994, with the petroleum exclusion in tact.

Thereafter, on or about June 27,1994, the Commercial Rulings Division upheld the exclusion of the gasoline and diesel fuel from Ammex's duty-free classification. This ruling was later affirmed by U.S. Customs' Headquarters Ruling 227385 on February 12, 1998. Having exhausted the requisite administrative process, Ammex summarily appealed the final U.S. Customs' ruling to the Court of International Trade (CIT). That court *overturned* the U.S. Customs' determination on August 25, 2000, holding that gasoline and diesel fuel is not excluded by statute from being designated as duty-free merchandise.[6] Customs subsequently issued a letter dated September 5, 2000, granting Ammex's request to expand its duty-free operation to include gasoline and diesel fuel.[7]

*Fuel Purchases*

During the quarterly periods at issue, Ammex purchased gasoline and diesel fuel from several suppliers (including Amoco Oil Co., Atlas Oil Co., Viking Oil, Peerless Distributing Co., and BP Oil) through purchasing agents (Central Cartage Co. and Fleet Fuel, LLC). In the cost of the gasoline and diesel fuel purchased by Ammex, its suppliers included a line item amount for federal manufacturer's excise tax. It was at the point that the suppliers removed the fuel purchased by Ammex from the former's terminal rack that the federal manufacturer's excise tax was first imposed on the fuel pursuant to 26 U.S.C. § 4081.[8] Following the purchase, the various carriers delivered the gasoline and diesel fuel from local points to Ammex's bulk storage tanks at its Ambassador Bridge facility. Ammex thereafter sold the gasoline and

diesel fuel at retail, whereupon it was placed directly into the fuel tanks of its customers' vehicles. Those customers then immediately proceeded to Canada.

*Cost/Price of Fuel*

Following are examples of Ammex's fuel costs and fuel sales prices taken from various invoices and sales receipts during the periods in issue:

Cost: On or about December 9, 1995, Ammex purchased 13,401 gallons of diesel fuel from BP

Oil Company for a total invoice price (including all separately stated charges for state and federal taxes that had been imposed) of $12,705.42, or $0.9481 per gallon. The stated "net price ex tax" on the invoice for diesel fuel was $0.5434. The separately stated charges with respect to federal and state excise taxes were $0.244 and $0.09, respectively.

On or about December 10, 1995, Ammex purchased 13,499 gallons of diesel fuel from BP Oil Company for a total invoice price (including all separately stated charges for state and federal taxes that had been imposed) of $12,976.94, or $0.9613 per gallon. The stated "net price ex tax" on the invoice for diesel fuel was $0.5560. The separately stated charges with respect to federal and state excise taxes were $0.244 and $0.09, respectively.

Price: On December 17, 1995, Ammex sold diesel fuel for a stated unit price of $1.139 per gallon. The stated unit price was reduced by a "fuel tax discount" of $0.06 per gallon, pro-

---

**6.** *Ammex, Inc. v. United States,* 116 F.Supp.2d 1269, 1275–276 (Ct. Int'l Trade 2000).

**7.** *But see Ammex, Inc. v. United States,* 193 F.Supp.2d 1325, 1326, 1329 (CIT 2002)(where Ammex implicitly acknowledges a prospective limitation on the grant in the September 5, 2000 letter, and the court constrains the reach of its August 25, 2000 ruling).

**8.** 26 U.S.C. § 4081 provides in pertinent part:

There is hereby imposed a tax...on (i) the removal of a taxable fuel from any refinery, (ii) the removal of a taxable fuel from any terminal, (iii) the entry into the United States of any taxable fuel for consumption, use, or warehousing, and (iv) the sale of a taxable fuel to any person who is not registered under section 4101 unless there was a prior taxable removal or entry of such fuel under clause (i), (ii), or (iii).

Taxable fuel is defined as gasoline and diesel fuel. Treas. Reg. § 48.4081–1(b).

ducing a net sales price of $1.079 per gallon.[9]

Cost: On or about December 13, 1995, plaintiff purchased 8,997 gallons of regular unleaded gasoline from Peerless Distributing Co. for a total invoice price (including all separately stated charges for state and federal taxes that had been imposed) of $8,643.85, or $0.9607 per gallon.

On or about December 14, 1995, plaintiff purchased 9,000 gallons of regular unleaded gasoline from Peerless Distributing Co. for a total invoice price (including all separately stated charges for state and federal taxes that had been imposed) of $8,885.25, or $0.9873 per gallon.

Price: On December 18, 1995, Ammex sold regular unleaded gasoline for $1.099 per gallon.

Cost: On or about April 1, 1996, plaintiff purchased 9,011 gallons of regular unleaded gasoline from Atlas Oil Company, for a total invoice price (including all separately stated charges for state and federal taxes that had been imposed) of $9,499.84, or $1.054 per gallon.

Price: On April 2, 1996, plaintiff sold regular unleaded gasoline for $1.229 per gallon.

*Filings with the IRS*

Plaintiff filed quarterly Form 8849 with the IRS claiming a refund of federal fuel excise taxes for each of the periods in suit. Those refund claims essentially stated that: (1) the fuel was for a nontaxable use, (2) Ammex was a sterile duty-free store at the Canadian border, and (3) all of the fuel it sold was exported to Canada.

The IRS, by letter from the Michigan Appeals Office, dated May 28, 1997, disallowed plaintiff's claims for refund of the federal excise taxes for all periods in issue for the stated reason(s): "You are not entitled to refunds of diesel fuel tax and gasoline tax since you have not established the diesel fuel and gasoline sold constituted *export* sales. You have not established you are the *party eligible* for the diesel fuel and gasoline tax refunds." [10]  Emphasis added.

With respect to all of the federal excise taxes paid on the fuel purchased and sold for any period in suit, it is undisputed that (1) plaintiff did not file with the IRS any federal excise tax returns reporting any such tax liability, (2) the IRS did not make any such tax assessments against plaintiff, (3) plaintiff did not pay directly to the United States Treasury or to the IRS any amount, and (4) the IRS did not collect from plaintiff any such taxes.

## SUMMARY JUDGMENT

Summary judgment is proper when it appears from the pleadings that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  RCFC 56.  On summary judgment, the inferences to be drawn from the underlying facts contained in such materials as affidavits, depositions; and exhibits must be viewed in a light most favorable to the party opposing the motion.  *Id.*

The trial judge's primary function then is not to weigh the evidence and determine the truth of the factual matter, but rather it is to determine whether there is a genuine factual issue for trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Substantive law will identify which facts are material.  *Id.* at 248, 106 S.Ct. 2505.  Only disputes over operative factual issues that could affect the outcome of the suit under the governing law will properly preclude summary judgment.  *Id.*

Here at bar, the substantive question before the court is:  Whether an operator of a sterile duty-free enterprise under U.S. Customs regulations should be viewed the same as an exporter within the meaning of the Export Clause and pertinent sections of the

---

9.  The fuel tax discount above relates to a state tax imposed on truckers for the privilege of displaying a Michigan state decal on their trucks.

10.  This explanation from the IRS for disallowance of claims applies to all of the tax periods at issue, although reflected in separately issued/dated letters.

Internal Revenue Code? This perplexing question invites the court to critically examine a quagmire of factual and legal issues in deciding the motion for summary judgment. Indeed, summary judgment, as here, can yield a harsh result and therefore should be applied with caution.[11] Consequently, where the trial court has reason to believe that the better course would be to proceed to trial, summary judgment should be denied.[12]

The court finds that trial is warranted on at least two material fact issues upon which the parties do not agree, to wit——(1) Whether Ammex was authorized to sell gasoline and diesel fuel duty-free during the periods in suit; and (2) Whether the fuel was in fact sold free of tax or duty. Hence, the required course, given the record, is to proceed to trial. Thus, for the reasons set forth below, defendant's motion for summary judgment is granted in part and denied in part, and plaintiff's cross-motion for summary judgment is denied.

### DEFENDANT'S MOTION

Defendant essentially set forth the following six issues as to *both* gasoline and diesel fuel, which the court will address *seriatim:*

*As to both the gasoline and diesel fuel:*

(1) Does Plaintiff have standing under the general rules applicable to tax refund actions to claim a refund of excise taxes allegedly paid to its suppliers when it purchased fuel?

(2) Does Plaintiff have standing under the Export Clause of the United States Constitution to claim a refund of federal excises taxes that it allegedly paid when it purchased gasoline and diesel fuel from its suppliers?

(3) Does Plaintiff have standing to seek a refund under 26 U.S.C. § 6416(c)?

*As to the diesel fuel only:*

(4) Does Plaintiff have standing to seek refund payment under 26 U.S.C. § 6427(*l*)?

*As to the gasoline only:*

(5) Does Plaintiff have standing to seek a refund of gasoline excise taxes pursuant to the special provisions of 26 U.S.C. § 6416(a)(4)? And

(6) Was the gasoline sold by Plaintiff for export, and, if so, was the gasoline exported before any other use within the meaning of 26 U.S.C. § 4221(a)(2)?

Def. Motion at 4.

### Standing

■ The case-or-controversy doctrines provide fundamental limits on federal judicial power in our system of government. *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Perhaps the most important of these doctrines is the Article III doctrine that requires a litigant to have "standing" to invoke the power of a federal court. *Id.* Standing raises the question whether the petitioner is entitled to have the court decide the merits of the issues in dispute. *Id.* at 750–51, 104 S.Ct. 3315. For a petitioner to establish such entitlement, it must allege a personal injury that is fairly traceable to the defendant's alleged unlawful conduct, and the likelihood of redress by the requested relief. *Id.* at 751, 104 S.Ct. 3315.

### Fundamental Elements of Standing

The three fundamental elements to establish standing are well-defined in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992):

(1) Plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) There must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) It must be likely, as opposed to merely

---

11. *See Greenberg v. Food and Drug Admin.,* 803 F.2d 1213, 1216 (D.C.Cir.1986).

12. ·*Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505 (citation omitted).

speculative, that the injury will be redressed by a favorable decision. (Citations omitted).

*General Rules Applicable to Tax Refund Actions*

■ Does Plaintiff have standing under the general rules applicable to tax refund actions to claim an overpayment of excise taxes allegedly paid only to its suppliers when it purchased fuel?

■ It has been well established that in order to maintain an action for the refund of federal taxes under the Internal Revenue Code, the plaintiff *must* be a taxpayer who has overpaid its own taxes. *Economy Plumbing and Heating Co., Inc. v. United States*, 470 F.2d 585, 200 Ct.Cl. 31 (1972).[13] The term "taxpayer" is applied in the *strictest* sense contemplated by the Internal Revenue Code, and means an entity who pays, overpays, or is subject to pay its own taxes. *Id.*, 470 F.2d at 590 n. 3.

■ In *Economy Plumbing, supra*, the plaintiff prevailed against the government under a contract settlement claim. But instead of remitting the funds owed to the plaintiff, the government diverted plaintiff's funds to offset an unrelated tax liability of the plaintiff's partner. The plaintiff argued that because the funds due to it under the contract settlement were improperly diverted by the government to pay the tax liability of another, plaintiff became a taxpayer who overpaid taxes. The Court of Claims flatly declined to recognize the plaintiff as a taxpayer stating "a nontaxpayer cannot overpay taxes and consequently there is no overpayment for him to claim by way of refund." *Id.* at 590. Therefore, persons who are not taxpayers are not within the system and can obtain no benefit by following the procedures prescribed for taxpayers, such as the filing of claims for refund. *Id.* at 589.

Plaintiff Ammex's suppliers, in the present case, included federal excise taxes as a line-item in the invoice cost of the gasoline and diesel fuel purchased by Ammex.[14] Ammex avers that its suppliers refused to sell the fuel without including the excise tax.[15] That tax, however, is a *manufacturer's* tax imposed under 26 U.S.C. § 4081. In *Gurley v. Rhoden*, 421 U.S. 200, 207–08, 95 S.Ct. 1605, 44 L.Ed.2d 110 (1975), the Supreme Court

---

13. *See also Collins v. United States*, 532 F.2d 1344, 1348, 209 Ct.Cl. 413 (1976) (In cases involving the payment of tax liabilities by a third party, "it is fundamental that the plaintiff cannot recover if the payment in issue was voluntary."); *Walsh Oil Co. v. United States*, 26 Cl.Ct. 426, 427 (1992) (The plaintiff was not the person who paid the tax, but a purchaser from that person and, therefore, it could not sustain a claim against the IRS.); *Bowen–Morrison Marketers, Inc. v. United States*, 820 F.Supp. 267, 269 (W.D.Va.1993) (Despite the fact that such rationale is equitably distasteful because it tends to elevate a technical formality over substance, it is legally sound, and is consistent with the general rule that before a person/taxpayer may commence an action in federal court for refund, the tax must have been paid by that taxpayer.); *Amigo Enterprises, Inc. v. United States*, 41 Fed.Cl. 462, 467 (1998) (Because the plaintiff did not pay taxes directly to the IRS, it lacks standing to sue for a refund.); *Muhammed v. United States*, 43 Fed.Cl. 742, 746 (1999) ("[A] middleman is not entitled to recover excise tax paid by its supplier, when, as plaintiff concedes, he paid no tax to the IRS directly and merely 'prepaid' tax to the extent that the supplier's invoices contained a charge for an excise tax on fuel.").

14. The following was extracted from an actual invoice received and paid by Ammex:

| Description | Gross Units | Net Units | Unit Price | Amount |
| --- | --- | --- | --- | --- |
| NL 87CNV Gasoline | 13,400 | 13,400 | $.5310 | $ 7,115.40 |
| SUBTOTAL | | | | 7,115.40 |
| Pre-paid Sales Tax | | | .0540 | 723.60 |
| Federal Excise Tax | | | .1840 | 2,465.60 |
| State Road Tax | | | .1490 | 1,996.60 |
| MI Env. Protect. Fee | | | .008750 | 117.25 |
| INVOICE TOTAL | | | | $12,418.45 |

Peerless Distributing Co., Southfield, Michigan, Invoice No. 22952, dated December 04, 1995.

15. Ammex's Cross–Motion at 8.

found that the legal incidence of the excise tax under 26 U.S.C. § 4081 falls upon the statutory producer, and not upon his purchaser.

The Supreme Court said "[t]he congressional purpose to lay the tax on the 'producer' and only upon the 'producer' could not be more plainly revealed." *Id.* at 205, 95 S.Ct. 1605. The statute clearly imposes the tax on the producer or supplier, and not its purchasers, such that "if the producer does not pay the tax, the Government cannot collect it from his vendees; the statute has no provision making the vendee liable for [the producer's] payment." *Id.* at 205–06, 95 S.Ct. 1605. The mere fact that Ammex may have borne the economic burden of the tax does not mean that it literally paid the tax. *Cook Oil Co., Inc. v. United States,* 919 F.Supp. 1556, 1562 (M.D.Ala.1996). Reality is that Ammex agreed to pay a price that its suppliers set to cover many costs, including, but not limited to, taxes. *Id.*[16]

In *Cook Oil Co., supra,* the plaintiff was a wholesale distributor and registered producer of diesel fuel. The plaintiff sought a refund of excise taxes included in its fuel purchase prices from its suppliers, but excluded by plaintiff in its sales prices to tax-exempt users. The district court acknowledged that the plaintiff was entitled by statute to purchase the fuel tax-free, but since it did not do so, and it did not pass on the tax to its purchasers, there was no available remedy to the plaintiff. The court reasoned that because the legal incidence of the tax fell upon the plaintiff's suppliers, not the plaintiff, and the tax statute did not require the suppliers to pass on the tax, the plaintiff therefore did not pay the tax.

Ammex is analogous to the plaintiff in *Cook Oil Co.* by claiming to have a statutory right to purchase fuel tax-free, and whose suppliers insisted upon passing along their own tax burden to plaintiff through the fuel purchase prices. And, just like the plaintiff in *Cook Oil Co.,* since the tax burden here is that of Ammex's suppliers and not Ammex,

plaintiff is without a remedy; it cannot claim a refund of the taxes it paid to the suppliers because it, by law, is not the taxpayer. *Ergo,* the mere filing of timely claims for refund does not *ipso facto* transform a nontaxpayer into a taxpayer entitled to a refund.

It is irrefutable that, for any period in suit, (1) plaintiff did not file with the IRS any federal excise tax returns reporting any such tax liability, (2) the IRS did not make any such tax assessments against plaintiff, (3) plaintiff did not pay directly to the United States Treasury or to the IRS any amount, and (4) the IRS did not collect from plaintiff any such taxes. *Gurley* established that the legal incidence of the excise tax is upon the manufacturer/supplier, and not upon the purchaser, Ammex. Ammex, therefore, is not the taxpayer and thus, does not have a legally protected interest under the general provisions of the Internal Revenue Code to pursue a claim for a refund.

Without a legally protected interest, there can be no injury in fact. Failure to establish an injury in fact alone defeats standing. Even if an indirect injury could be found, the defendant is not the cause of that injury; rather, it is the independent action of a third party not present in this suit, *i.e.,* Ammex's suppliers. Since there is no injury in fact, nor causation by the defendant, redress cannot be had. Hence, by operation of law, plaintiff's claim under this theory fails, and defendant is entitled to summary judgment on this standing issue.

While Ammex does not have standing under the general provisions of the tax code, the court will now determine whether Ammex has standing under the Export Clause and/or any of the several special provisions raised by plaintiff (in its complaint) and challenged by defendant on motion. Special provisions, *i.e.,* exemptions or exclusions from tax under the Internal Revenue Code, are to be construed strictly.[17]

---

**16.** Plaintiff, in turn, could have, and may have done the same with its fuel prices. This is a fact issue, discussed *infra,* that must be addressed on the merits.

**17.** *See Durando v. United States,* 70 F.3d 548, 550 (9th Cir.1995); *Weingarden v. Comm'r of Internal Revenue,* 825 F.2d 1027, 1029 (6th Cir.1987).

*Export Clause*

(2) Does plaintiff have standing under the Export Clause of the United States Constitution to claim a refund of federal excise taxes that it allegedly paid when it purchased gasoline and diesel fuel from its suppliers?

■ The Export Clause of the United States Constitution provides that "No Tax or Duty shall be laid on Articles exported from any State." U.S. Const. art. I, § 9, cl. 5.

The same analysis *supra* pertaining to the general rules applicable to tax refunds under the tax code applies here to the Export Clause. Standing raises not the question whether a tax or duty unduly fell upon the fuel, but whether plaintiff is the *proper party* to lay claim to the alleged unlawfully collected tax. If defendant did not lay, assess, exact, or otherwise collect from plaintiff any federal excise taxes on the gasoline and diesel fuel during the periods at issue, then the *plaintiff* cannot proceed under this theory. Plaintiff has not shown the court how, pursuant to the Export Clause, it can obtain from the government, by way of refund, that which it did not pay to the government.

Where the defendant by direct act has not laid any tax or duty upon the plaintiff, and no such act is fairly traceable to the defendant (since the incidence of the tax was upon the supplier(s)), plaintiff cannot establish an injury in fact caused by the defendant.[18] Without an injury in fact, the plaintiff cannot have standing.[19] Therefore, plaintiff's refund claim must fail under this theory, and defendant must be granted summary judgment as a matter of law.

*Special Provision under 26 U.S.C. § 6416(c) for exporters*

(3) Does Plaintiff have standing to seek a refund under 26 U.S.C. § 6416(c)?

■ This statutory provision reads in its entirety as follows:

Refund to Exporter or Shipper.—Under regulations prescribed by the Secretary the amount of any tax imposed by chapter 31, or chapter 32 erroneously or illegally collected in respect of any article exported to a foreign country or shipped to a possession of the United States may be refunded to the *exporter or shipper* thereof, if the person who paid such tax waives his claim to such amount.

26 U.S.C. § 6416(c). Emphasis added.

In order for Ammex to establish standing under the above provision, it must show that: (a) the fuel was exported, (b) it was the "exporter or shipper" thereof, and (c) the person who paid the tax waives his claim.

(a) Exportation

Whether the fuel was exported turns on two collateral inquiries: (i) whether the fuel had a duty-free classification at the time,[20] and (ii) whether fuel pumped directly into the fuel supply tank of a vehicle can be deemed exported. The first inquiry is a fact question on the merits, discussed in greater detail *infra,* and must be reserved for trial. But only for purposes of establishing standing, and viewing facts in a light most favorable to the non-moving party, the duty-free classification is presumed here.

The second and equally important inquiry, whether fuel sold by a duty-free enterprise and pumped directly into the fuel tank of a motor vehicle that is driven to a foreign territory can be deemed exported, arises because defendant points to two IRS Revenue Rulings purporting that fuel pumped directly into the fuel tank of a motor vehicle and driven out of the United States is *not* treated as an export for purposes of a tax exemption.[21] The reasoning therefor is that "the

---

**18.** *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

**19.** *Id.*

**20.** 19 U.S.C. § 1555(b)(1) states that "duty-free sales enterprises may sell and deliver *for export*

from customs territory duty-free merchandise...." Emphasis added.

**21.** *See* Rev. Rul. 69–150, 1969–1 C.B. 286 (pertaining to gasoline), and Rev. Rul. 72–38, 1972–1 C.B. 330 (pertaining to aviation fuel). Both (by analogy) reach diesel fuel. *See* IRS Market Segment Specialization Program Guideline, July 1995.

fuel contained in the tank when the vehicle leaves the United States is considered to be a part of the vehicle, and not a commodity being exported."[22] While those rulings may otherwise have proper application, they are clearly inapplicable to a sterile duty-free enterprise.

According to the August 25, 2000 decision by the CIT, a duty-free enterprise such as Ammex is not precluded by statute from selling gasoline and diesel fuel. Given that, it is a commonly known fact that duty-free stores generally cater to individual consumers engaging in retail transactions, rather than wholesalers dealing in bulk transactions. With that being the case, gasoline and diesel fuel sold by a duty-free store logically will be sold to individuals, that is, it will be delivered into the fuel tanks of motor vehicles, and not into storage containers of large transport vessels intended for wholesale or bulk quantities. Therefore, under the peculiar circumstance of the duty-free store, the IRS ruling letters are inapposite inasmuch as they do not contemplate the duty-free enterprise scenario.[23]

Based upon the foregoing, and only for purposes of establishing standing, the court finds that the fuel at issue was in fact exported.

#### (b) Exporter/Shipper

As a precursor to becoming a sterile duty-free operation, Ammex was required to "establish procedures to provide reasonable assurance that duty-free merchandise sold by the enterprise will be exported from the customs territory." 19 U.S.C.A. § 1555(b)(3)(A). Accordingly, Ammex's facility is configured in such a way that anyone entering the facility must depart the United States via the Ambassador Bridge and enter into Canada. By that circumstance, exportation clearly occurs in connection with Ammex's duty-free enterprise, but the operative question is who actually executes that expor-

tation. Stated differently, who is the party in a sterile duty-free transaction that performs the role of an exporter, in fact.

The term "exporter" is not statutorily defined but is defined in the legislative regulations as "the person named as shipper or consignor in the export bill of lading." Treas. Reg. § 48.0–2. Relevant statutes, however, do not use that term "exporter" when defining a duty-free operator. Instead, a duty-free operator is defined as "a person that sells, for use outside the customs territory, duty-free merchandise that is delivered from a bonded warehouse to an airport or other exit point for exportation by, or on behalf of, individuals departing from the customs territory." 19 U.S.C.A. § 1555(b)(8)(D).

Here, the operative statute defines what a duty-free operator is by describing what it does. It describes the duty-free operator as "a person that sells, for use outside the customs territory," and it describes the movement of the merchandise by the duty-free operator as being "delivered *from* a bonded warehouse *to* . . . *[an] exit point* for exportation by . . . individuals departing from the customs territory." Emphasis added. In crafting these regulations, the drafters chose their words carefully. In fact, they used many words to describe the role of the duty-free operator as anything but an exporter. The word "exporter" is a simple word that the drafters certainly were aware of, particularly here in the context of exportation. But they chose not to use that word to define the duty-free operator's role.

This court, then, is left to deduce that a duty-free operator is neither an exporter nor shipper within the meaning of the tax code and/or applicable statutes, but rather it is a domestic retailer and a mere facilitator of "exportation [that is carried out] by . . . individuals departing from the customs territo-

---

22. Rev. Rul. 69–150, 1969–1 C.B. 286.

23. *See Exxon Corp. v. United States,* 40 Fed.Cl. 73, 89 n. 27 (1998)(stating that Revenue Rulings do not have the force and effect of law and Treasury Regulations)(citing, among other cases, *Stubbs Overbeck & Assoc. v. United States,* 445

F.2d 1142, 1146–47 (5th Cir.1971) ("A [revenue] ruling is merely the opinion of a lawyer in the agency and must be accepted as such. It may be helpful in interpreting a statute, but it is not binding on . . . the courts.")).

ry." [24]  Therefore, the only remaining party to the transaction to fulfill the role of the "exporter," by analogy, is the "individual[ ]" who is actually "departing from the customs territory" the customer.

### (c) Waiver of claim

While the record contains evidence of waivers of claim from at least two of plaintiff's suppliers, the affect of that evidence is inconsequential since we hold that Ammex is not an exporter within the meaning of 26 U.S.C. § 6416(c).

Because Ammex has not established that it is an exporter, it is without a legally protected interest under 26 U.S.C. 6416(c), in which case, it cannot have an injury in fact, and therefore lacks standing. Defendant is entitled to summary judgment as a matter of law on this issue.

*Special Provision under 26 U.S.C. § 6427(l) for ultimate purchasers of diesel fuel*

(4) Does plaintiff have standing to seek payment under 26 U.S.C. § 6427(l)?

■  The analysis under this statute pertains only to plaintiff's diesel fuel purchases. Subsection 6427(l) provides in pertinent part that "if (A) any *diesel fuel* on which tax has been imposed by section 4041 or 4081 ...is used by any person in a nontaxable use, the Secretary shall pay (without interest) to the *ultimate purchaser* of such fuel an amount equal to the aggregate amount of tax imposed on such fuel under section 4041, 4081, or 4091 as the case may be." 26 U.S.C. § 6427(l).[25]  Emphasis added.

While the term "ultimate purchaser" is not defined in the statute, it has been defined in case law. The Fifth Circuit court in *Valley*

*Ice & Fuel Co., Inc. v. United States* [26] held that the plain meaning of the term "ultimate purchaser" is simply "the purchaser in the stream of commerce who is intended to use the product himself—as opposed to a middleman who intended to resell the product." *Id.* Moreover, the *Valley Ice* court cites to several instances where Congress itself has defined the term as "the first person who in good faith purchases [the product] for purposes other than resale." *Id.*[27]

In the present case, Ammex definitively asserts that it purchased the diesel fuel for the sole purpose of resale through its duty-free operation at the Ambassador Bridge. Ammex's Cross–Motion at 8—9. Further, it is undisputed that Ammex in fact did resell the fuel to its retail customers—an act which clearly places it outside of the plain meaning of an ultimate purchaser. Since Ammex does not meet the definition of an ultimate purchaser, it cannot establish a legally protected interest under this special diesel fuel provision, hence it lacks standing. Defendant must, therefore, be granted summary judgment as a matter of law on this question.

*Special Provision under 26 U.S.C. § 6416(a)(4) for wholesale distributors of gasoline*

(5) Does Plaintiff have standing to seek a refund of gasoline excise taxes pursuant to the special provisions of 26 U.S.C. § 6416(a)(4)?

■  The analysis under this statute pertains only to plaintiff's gasoline purchases. Succinctly stated, the statute provides that: "a *wholesale distributor* who purchases any gasoline on which tax imposed by section 4081 has been paid and who sells the gasoline to its ultimate purchaser shall be treated as

---

**24.** That is not to say that the duty-free operator/enterprise does not have a unique legal existence. Obviously it does. Having been created by Congress, under the Omnibus Trade and Competitiveness Act of 1988, to encourage sales to persons departing the United States at border crossings and international airport terminals, the duty-free enterprise is permitted to engage in transactions free of tax or duty. And while strict requirements exist to ensure that the merchandise sold by these entities in fact leaves the United States, the governing statutes and regulations fall short of labeling the duty-free merchant an "exporter."

**25.** A nontaxable use includes the sale of any liquid for export, or for shipment to a possession of the United States, and in due course so exported or shipped. 26 U.S.C. §§ 6427(l)(2) and 4041(g)(3).

**26.** 30 F.3d 635, 638 (5th Cir.1994).

**27.** *See also Amigo Enterprises, Inc. v. United States,* 41 Fed.Cl. 462, 465 (1998); *Cook Oil Co., Inc. v. United States,* 919 F.Supp. 1556, 1563 (M.D.Al.1996).

the person (and the only person) who paid such tax." 26 U.S.C. § 6416(a)(4)(A). Emphasis added.

A wholesale distributor is defined as "any person who sells any gasoline taxable under section 4081 to producers, retailers, or to users who purchase in bulk quantities and accept delivery into bulk storage tanks." 26 U.S.C. § 6416(a)(4)(B). The term also includes "any person who makes retail sales of gasoline at 10 or more retail motor fuel outlets." *Id.*

Ammex alleged in its complaint that it was a "wholesale distributor," but it has not since shown that it sold gasoline to producers, retailers, users who purchased in bulk quantities, or that it made retail sales of gasoline at 10 or more retail outlets. In short, Ammex has not offered any facts or other evidence that it participated in any activities that would qualify it as a "wholesale distributor" within the meaning of the statute. Hence, Ammex has not shown that it has a legally protected interest to establish an injury in fact under 26 U.S.C. § 6416(a)(4). Without an injury in fact, there can be no standing. Defendant is, therefore, entitled to summary judgment as a matter of law on this question.

*Special Provisions under 26 U.S.C. §§ 6421(c) & 4221(a)(2) for any person who sells gasoline to another for exportation*

(6) Was gasoline sold by plaintiff for export, and, if so, was the gasoline exported before any other use within the meaning of § 4221(a)(2)?

■ The provisions herein pertain only to Ammex's gasoline purchases. Under 26 U.S.C. § 6421(c): "Exempt Purposes. If gasoline is sold to *any person* for any purpose described in paragraph (2), (3), (4), or (5) of section 4221(a), the Secretary shall pay (without interest) to such person an amount equal to the product of the number of gallons of gasoline so sold multiplied by the rate at which tax was imposed on such gasoline by section 4081." Emphasis added.

Subsection 4221(a) states: "General rule. Under regulations prescribed by the Secretary, no tax shall be imposed under this chapter...on the sale by the manufactur-er...of an article-...(2) for export, or for resale by the purchaser to a second purchaser for export,...but only if such exportation or use is to occur before any other use...."

Subsection 6421(c) applies to "any person" who can demonstrate the applicable conditions in subsection 4221(a)(2). Ammex, on this record, can establish a legally protected interest under these special provisions if it can show that the gasoline it purchased from its suppliers was either for export, or that it resold the gasoline to a second purchaser for exportation, and that the exportation occurred before any other use. Again, whether the fuel had a duty-free classification at the time is a factor when determining whether exportation occurred. Rightly so, this fact question has been reserved for trial. Only for purposes of establishing standing, and reviewing facts in a light most favorable to the non-moving party, the classification is presumed here.

Irrefragably, Ammex resold the gasoline to a "second purchaser for exportation" when it sold gasoline to its customers. This is supported by a plain reading of 19 U.S.C.A. § 1555(b)(8)(D) where it defines a duty-free enterprise as "a person that *sells*... duty-free merchandise that is delivered from a bonded warehouse to...[an] exit point *for exportation by... individuals departing from the customs territory.*" Emphasis added. Ammex clearly satisfies the first part of the provision in subsection 4221(a)(2). Now, and finally, the court addresses the question whether the exportation occurred before any other use.

Specifically, the question is whether fuel pumped directly into a vehicle's fuel tank and driven less than two miles to the border crossing constitutes use (of the totality of the purchased fuel) prior to exportation. This court answers that question in the negative. Any other answer would stand reason on its head given the facts here and the context of a duty-free enterprise that presumably is permitted to sell motor fuel on an individual consumption basis. Law and logic bear out that the exportation begins with the consumer's purchase, and the fuel necessarily enters the stream of exportation at the moment it is

placed into the fuel supply tank.[28] Exportation then continues until the consumer crosses, in this case, the Canadian border.

Plaintiff thus satisfies the injury in fact element, where plaintiff is the "person" who purchased gasoline for resale to a second purchaser for export, and the exportation occurred before any other use. Here, clearly, there is a legally protected interest, i.e., an injury in fact. Causation, the second element of standing, can be said to be fairly traceable to the defendant (under this special statutory provision) where there is record evidence that defendant taxed, or caused to be taxed, Ammex's suppliers in accordance with the operative statute which states that "[t]here is hereby imposed a tax … on– … (ii) the removal of a taxable fuel from any terminal." 26 U.S.C. 4081(a)(1)(A). Where there is an injury in fact, as here, and causation is fairly traceable to the defendant (by statute), there is the likelihood of redress.

Consequently, Ammex satisfies all of the elements of standing under the statute discussed hereunder with respect to its purchases of gasoline, thereby compelling this court to deny defendant the right to summary judgment as a matter of law on this standing issue.

## PLAINTIFF'S CROSS–MOTION

█ Plaintiff sets forth a single question on cross-motion that raises factual issues that preclude this court from granting summary judgment in its favor. The question is: "Whether Ammex, an operator of a duty-free store that is authorized by the United States Customs Service to sell motor fuel on a duty-free basis for use outside the United States…, is due a refund of… excise taxes it paid [its suppliers] on the motor fuel that it purchased solely for export [which was] sold at Ammex's duty-free facility." Pl. Cross-Motion at 2.

The gravamen of plaintiff's question is rooted in genuine issues of material fact which by law require this court to deny plaintiff's cross-motion. Foremost of which is—whether Ammex in fact sold the motor fuel duty-free; that is, the efficacy of plaintiff's claim, whether Ammex actually passed on the cost of the excise tax to its retail customers, is in dispute. Also in issue is whether Ammex was in fact authorized by the U.S. Customs Service to sell motor fuel duty-free during the operative periods. Given these genuine issues of material fact, said motion, this court is constrained to hold, was improvidently filed.

### Cost vs. Sales Price of Fuel

Whether Ammex passed on the cost of the excise tax in its sales prices to its customers is a critical fact issue because under no circumstances can plaintiff recover on its refund claim if it has actually passed on the excise taxes in its fuel prices. If plaintiff has passed on the tax, its claim for a refund must end. Principles of equity and fairness prevent this court from granting plaintiff's prayed for relief under any theory if the plaintiff already has been made whole by passing on the tax in the sales prices of the fuel.

Defendant both acknowledges, then attempts to undermine, the relevance of this issue.[29] In its reply brief, defendant clearly states that it "disputes plaintiff's contention that it did not pass on the economic burden of the federal excise taxes." Def. Reply Br. at 7. Then, in response to plaintiff's proposed finding 44 alleging that it "did not collect, or pass on the cost of, federal excise taxes in the price of motor fuel sold during the period at issue,"[30] defendant averred that "plaintiff's proposed finding 44 is not relevant to any issue herein and the proposed finding should not be made by the Court."[31]

28. See Duty Free Shoppers, Ltd. v. Tax Commissioner, 464 F.Supp. 730, 735 (D.Guam 1979)(citing Department of Revenue of State of Washington v. Ass'n. of Washington Stevedoring Companies, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978); Kosydar v. Nat'l Cash Register Co., 417 U.S. 62, 94 S.Ct. 2108, 40 L.Ed.2d 660 (1974)).

29. See Def. Reply Brief at 7; Def. Stmt. of Genuine Issues at 4; But see Def. Motion to Strike at 5; Def. Reply in Support of Motion to Strike at 5; Def. Supp. Stmt. of Genuine Issues at 3.

30. Def. Supp. Stmt. of Genuine Issues at 3.

31. Ammex's Add'l PFUF at 1.

There is sufficient evidence that plaintiff's actual fuel costs (excluding taxes) averaged fifty-four cents, and various taxes included by the supplier added another forty to forty-five cents, yet Ammex's fuel sales prices tended to be some amount above those *combined* costs. Def. Reply Brief at 7. Plaintiff insists that it did not pass on the tax, and submitted conclusory affidavits of same.[32] It proffered the term "marginal analysis," which it failed to explain, to identify the theory it applied in arriving at its pricing structure, but nothing more.[33] In short, plaintiff avers that its sales prices did not pass through the subject excise taxes.

Defendant, on the other hand, provided copies of several of Ammex's invoices reflecting plaintiff's costs,[34] and compared them to sales receipts bearing plaintiff's sales prices.[35] In each instance, the sales prices far exceeded plaintiff's total costs. This variance left open by both sides clearly creates genuine issues of material fact for trial as to whether the costs of the federal excise taxes were in fact passed on to Ammex's retail customers.

*Authorization by U.S. Customs*

Whether Ammex had in fact received authorization from U.S. Customs to sell motor fuel duty-free during the periods in suit is also a material fact in issue. The record shows that on December 23, 1993, U.S. Customs' Detroit branch granted Ammex tentative approval to operate as a sterile duty-free store. That tentative approval, however, *excluded* the sale of gasoline and diesel fuel. After Ammex urged Customs to reconsider the petroleum exclusion, the district director of the Detroit branch sought an internal ruling from the Commercial Rulings Division in Washington, D.C. In the interim, the Detroit branch issued its final approval of Ammex's classification as a "sterile duty-free operation," on April 6, 1994, *with the petroleum exclusion in tact.*

Thereafter, on or about June 27, 1994, the Commercial Rulings Division upheld the exclusion of the gasoline and diesel fuel from Ammex's duty-free classification. This ruling was later affirmed by U.S. Customs' Headquarters Ruling 227385 on February 12, 1998. Having exhausted the requisite administrative process, Ammex appealed the final U.S. Customs' ruling to the Court of International Trade. That court, on August 25, 2000, overturned the U.S. Customs' determination holding that gasoline and diesel fuel is *not* excluded by statute from being designated as duty-free merchandise. Customs subsequently issued a letter, which is not of record, dated September 5, 2000, allegedly granting Ammex's request to expand its duty-free operation to *include* gasoline and diesel fuel. The exigent question is two fold—(i) whether there is such a letter, and (ii) whether the alleged September 5, 2000 grant by Customs was retroactive or prospective. The foregoing appears to raise mixed questions of fact and law.

Given all of the foregoing, genuine issues of material fact exist for trial which precludes a grant of summary judgment for plaintiff. Therefore, plaintiff's cross-motion for summary judgment is denied.

## CONCLUSION

Since the government did not exact, assess, or collect any federal excises taxes from Ammex, Ammex does *not* have standing to claim a refund under the general provisions of the Internal Revenue Code or the Export Clause. Ammex, additionally, could not establish standing under the special provisions of the tax code pertaining to wholesale distributors, ultimate purchasers, or exporters and shippers. However, plaintiff has established standing under 26 U.S.C. §§ 6421(c) and 4221(a)(2) with respect to its *gasoline* purchases and sales *only.*

Based upon all of the foregoing:

---

**32.** Ammex's Cross–Motion, App. B, Exhibit 13 at 315; Ammex's Reply Brief in Support of its Cross–Motion, Exhibit D at 27.

**33.** Ammex's Reply Brief in Support of its Cross–Motion, Exhibit D at 28.

**34.** *See* Def. Reply Brief, Exhibit 11.

**35.** *See* Ammex's Cross–Motion, App. B, Exhibit 6.

Defendant's motion for summary judgment raising the issue of standing is hereby GRANTED, in part, and DENIED, in part, as follows:

As to both the gasoline and diesel fuel under (1) the general rules applicable to tax refund actions, (2) the Export Clause of the United States Constitution, and (3) 26 U.S.C. § 6416(c) (pertaining to exporters and shippers)—GRANTED;

As to the diesel fuel only under (4) 26 U.S.C. § 6427($l$) (pertaining to ultimate purchasers)—GRANTED;

As to the gasoline only under (5) the special provision in 26 U.S.C. § 6416(a)(4) (pertaining to wholesale distributers)—GRANTED; and

As to the gasoline only under (6) the special provisions in 26 U.S.C. §§ 6421(c) & 4221(a)(2) (pertaining to any person who sells gasoline to another for exportation)—DENIED.

Plaintiff's cross-motion for summary judgment is hereby DENIED inasmuch as there are genuine issues of material fact remaining for trial.

The following pretrial schedule is hereby implemented on the issues remaining for trial:

1. All discovery shall be completed on or before June 10, 2002;

2. Counsel shall comply with paragraph 10 of Section V of Appendix G on or before June 25, 2002;

3. Plaintiff shall comply with paragraphs 11–13 * of Section V of Appendix G on or before July 12, 2002;

4. Defendant shall comply with paragraphs 11–13 * of Section V of Appendix G on or before August 5, 2002;

The parties are not required to file proposed findings of fact (paragraphs 11(a) and 11(b)).

5. The parties shall comply with paragraphs 14–15 of Section V of Appendix G on or before August 5, 2002.

As to paragraph 14 (Stipulations), the joint memorandum shall be in two parts:

a. The first part shall contain separately numbered paragraphs covering all matters to which the parties have stipulated during the course of the proceedings. The stipulations must be comprehensive and the fact that any matter may have been established during discovery by admission or otherwise is not grounds for omitting it from stipulation. A party may not refuse to stipulate as to the content or purport of a document simply by claiming that the document is the best evidence of its content. Nor is the fact that a party deems a fact irrelevant a sufficient basis for refusing to stipulate to its existence. Relevance may be argued in the Memorandum Of Contentions Of Fact and Law.

b. The second part of the memorandum shall set forth any matters a party proposes to be stipulated, as to which the parties have failed to reach agreement, and which the proponent of the stipulation believes are not reasonably subject to dispute. Each such proposed stipulation shall be set forth in full, together with the reasons the proponent believes the matter is not subject to dispute. The opposing party must explain beneath why and to what extent it believes the matter to be in dispute.

6. If contemplated, the parties shall comply with paragraph 16 of Section V of Appendix G on or before August 5, 2002;

7. The pretrial conference shall be held at 10:00 a.m. on Monday, August 26, 2002, at the Howard T. Markey National Courts Building, 717 Madison Place, N. W., Washington, D.C. The exact courtroom location will be posted in the lobby at that time. A trial date and location will be discussed at this conference.

IT IS SO ORDERED.

---

* Witnesses shall be characterized as fact, expert, or fact/expert. The anticipated length of the trial and requested trial location shall also be stated.