**AMMEX, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

Nos. 99–338T, 99–778T.

United States Court of Federal Claims.

March 26, 2003.

J. William Koegel, Jr., Washington, D.C., attorney of record for plaintiff.

William K. Drew, Washington, D.C., with whom was Eileen J. O'Conner, Assistant Attorney General, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge.

### I. INTRODUCTION

This case involves a federal excise tax claim by a duty-free enterprise for a payment pursuant to 26 U.S.C. § 6421(c), *infra*, of an amount equal to the manufacturer's excise tax that it paid to its suppliers on gasoline purchases occurring between April 1994 and December 1998, inclusive. Although this court in earlier proceedings found that plaintiff had standing to proceed to trial under the aforementioned statute, plaintiff, at trial, failed to carry its burden of proof to establish that it did not pass-on said excise tax to its customers pursuant to 26

U.S.C. § 6416(a).[1] For that reason, we hold, as stated below, plaintiff is not entitled to receive the payment that it seeks under subject Internal Revenue Code section 6421(c).

## II. JURISDICTION

Pursuant to the Tucker Act, 28 U.S.C. § 1491(a), this court has jurisdiction to hear claims against the United States that are founded upon the Constitution or any act of Congress, not sounding in tort. *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967). Also, it is well established that the Tucker Act, in that connection, narrowly confers jurisdiction only and alone does not convey a substantive right upon a party to sue the government.[2] Therefore, to properly establish jurisdiction in this court, a party must concurrently plead entitlement to monetary relief pursuant to some other federal law or regulation.[3] Consistent therewith, plaintiff herein has, on this record, properly claimed or alleged a right to receive monetary payment from the U.S. Treasury pursuant to section 6421(c) of the Internal Revenue Code.

## III. FACTUAL/PROCEDURAL BACK-GROUND

Ammex, Inc. ("Ammex") operates a sterile duty-free enterprise located at 3400 West Lafayette, Detroit, Michigan. Although its postal address properly places it within the United States, it is physically situated beyond the U.S. Customs exit point,[4] near the entrance to the Ambassador Bridge,[5] within two miles of the Canadian border. There, Ammex engages in retail sales of a variety of duty-free goods such as liquors, wines, cigarettes, watches, gold jewelry and perfumes, among other things. This Ambassador Bridge location of Ammex also sells gasoline and diesel fuel, which are dispensed directly into the fuel tanks of vehicles departing for Canada. These retail fuel sales,[6] however, were not inclusive in Customs' tentative, *i.e.,* December 1993, nor final, April 1994, grant to Ammex to operate as a "sterile"[7] duty-free enterprise.

Prior to Ammex's duty-free store becoming sterile, it was not permitted to carry "live" duty-free merchandise on its shelves. Persons could buy and take immediate delivery of gasoline and diesel fuel and other domestic retail products at point of sale, but not duty-free goods. Anyone purchasing duty-free merchandise would pay at the cash register, then drive *beyond* the then-situated U.S. Customs exit point (at the bridge entrance), travel onto the bridge, stop along the far right lane of the bridge, and pick-up the

---

1. "(1) General rule.—No credit or refund of any overpayment of tax imposed by chapter 31 (relating to retail excise taxes), or chapter 32 (manufacturers taxes) shall be allowed or made unless the person who paid the tax establishes, under regulations prescribed by the Secretary, that he—(A) has *not* included the tax in the price of the article with respect to which it was imposed and has *not* collected the amount of the tax from the person who purchased such article." 26 U.S.C. § 6416(a)(1)(A) (emphasis added).

2. *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

3. *Eastport Steamship Corp.*, 178 Ct.Cl. at 605–06, 372 F.2d at 1007–08.

4. The U.S. Customs exit point is an area in proximity to an actual exit for departing from the customs territory. 19 U.S.C. § 1555(b)(8)(F).

5. The Ambassador Bridge, privately owned and operated by the Detroit Bridge International Company ("DBIC"), is the thoroughfare between the United States (when departing from Detroit, Michigan) and (entering into Windsor,) Canada. Trial Tr. 49:16–24 (Nov. 19, 2002).

6. Plaintiff's initial claim aggregating $6,090,975 included both gasoline and diesel fuel purchases. *Ammex, Inc. v. United States*, 52 Fed.Cl. 303, 305 (2002). Upon a finding on cross-motions for summary judgment that plaintiff only had standing under § 6421(c) to proceed to trial, its claim was reduced to $3,302,486, as subject statute applies exclusively to gasoline purchases. *Ammex, Inc. v. United States*, 52 Fed.Cl. 555, 556 (2002).

7. In the context of a duty-free enterprise, the term "sterile" is defined as an area that is within the airport and to which access is restricted to those persons directly departing from the customs territory. In such cases, delivery will be made directly to the purchaser for carrying aboard the aircraft. 19 C.F.R. § 19.39(c)(1). Although defined within the context of a duty-free store located at an airport, the meaning is also transferable to a land border location, as applied by U.S. Customs herein.

duty-free merchandise at Ammex's "crib"[8] operation.

Due to heavy traffic volume on the bridge,[9] vehicles pulling up to Ammex's crib pick-up location created additional congestion on the bridge and sometimes minor traffic collisions. Consequently, Ammex's request to become a sterile area served to (i) relocate the U.S. Customs exit point to a place preceding the entrance to Ammex's facility, thereby (ii) enabling Ammex's customers of fuel and other domestic purchases to take immediate delivery of duty-free goods directly off of the shelves, thus (iii) alleviating the need for a crib operation and consequently eliminating the traffic bottleneck on the Ambassador Bridge.

Of paramount concern to U.S. Customs, when considering Ammex's request to become a sterile operation, was whether Ammex could provide the same reasonable assurance of exportation of the duty-free merchandise that it sold, as was the case then in existence with the exit point situated closer to the bridge entrance. In that connection, Ammex provided gate, fencing and toll booth placement drawings establishing to Customs that its proposed relocation of the U.S. Customs exit point would operate as well as the then existing exit point, which by design compelled any vehicle beyond the exit point to proceed directly to Canada.

When Customs tentatively authorized Ammex's request to become a sterile duty-free operation in December 1993, however, it expressly informed Ammex that "[p]ermission is not granted to establish a bonded petroleum product operation."[10] Customs specifi-

cally noted in effect that plaintiff had neither requested bonding of its petroleum products, nor would fencing them inside of a sterile area change the character of otherwise domestic fuel sales. In response thereto, plaintiff formally requested bonding of its petroleum products in January 1994. Accordingly, the district director in Detroit sought internal advice regarding Ammex's subsequent request in a March 1994 memorandum. In response, in June 1994, the Commercial Rulings Division (in Washington, D.C.) denied Ammex's request in HQ 225287, which was later affirmed by HQ 227385 in February 1998 after an appeal by Ammex.

Refusal by Customs to authorize plaintiff to operate a bonded petroleum product operation, that is, to treat its gasoline sales as duty-free merchandise, arguably, is the gravamen of plaintiff's cause of action.[11] Said denial by Customs allegedly caused plaintiff's fuel suppliers to pass-on to plaintiff the manufacturer's excise tax assessed on the suppliers' removal of fuel from the terminal rack, pursuant to 26 U.S.C. § 4081,[12] when Ammex purchased gasoline during the operative periods, to wit, April 1994 through December 1998. Plaintiff's prayer before this court is for a payment in an amount equal to that which it paid to its suppliers as allocated on plaintiff's purchase invoices as being attributable to the *manufacturer's* federal excise tax—$3,302,486 (§ 6421(c)).

For a more comprehensive account of the underlying facts and the procedural history based upon earlier proceedings, see *Ammex, Inc. v. United States,* 52 Fed.Cl. 303 ([April]

8. The term "crib" means a bonded area, separate from the storage area of a Class 9 warehouse, for the retention of a small supply of articles for delivery to persons departing from the United States. 19 C.F.R. § 19.37(a).

9. Traffic volume on the Ambassador Bridge in the direction of the Canadian border is approximately 15,000 vehicles daily. Trial Tr. 104:8–13 (Nov. 19, 2002).

10. Pl.Ex. 4, Dec. 23, 1993 Letter from Dept. of Treas. U.S. Customs Service.

11. At trial, plaintiff broadened its recovery theory to one that has less reliance on the need for

duty-free classification in order to comply with the relevant tax statute.

12. 26 U.S.C. § 4081 states in pertinent part:

"There is hereby imposed a tax ... on (i) the removal of a taxable fuel from any refinery, (ii) the removal of a taxable fuel from any terminal, (iii) the entry into the United States of any taxable fuel for consumption, use, or warehousing, and (iv) the sale of a taxable fuel to any person who is not registered under section 4101 unless there was a prior taxable removal or entry of such fuel under clause (i), (ii), or (iii)."

**4**

2002)[13] whereupon, on cross-motions for summary judgment, this court found that plaintiff established standing to proceed to trial pursuant to 26 U.S.C. § 6421(c) respecting its gasoline purchases only. Note that section 6421(c) provides for payment to a non-taxpayer claimant who has borne the economic burden of a manufacturer's federal excise tax on gasoline purchases imposed under 26 U.S.C. § 4081, and who has used same for a recognized exempt purpose. The relevant exempt purpose in the case here at bar is found in paragraph (2) of section 4221(a), *infra.*

During the trial, plaintiff adduced evidence of the physical structure and design of Ammex's duty-free facility, in part, through a site visit augmented with extensive testimony. The court thereby observed first-hand the technical layout of Ammex's facility, its proximity and relation to the U.S. border (and exit point), and the direct flow of traffic through Ammex's establishment and directly into Canada. Notwithstanding, some *de minimis* testimonial evidence was adduced at trial intimating that there have been breaches along the route of vehicles departing the U.S. destined for Canada.[14] Such evidence carries no probative weight against the overwhelming evidence to the contrary. This is so in view of the fact that U.S. Customs—(i) never kept a written record of any such alleged breaches, (ii) never forwarded a written report of any alleged breach by Ammex, and (iii) did not, at any time during the operative periods, revoke, or seek to revoke, Ammex's "sterile" authorization.[15]

Critical evidence offered at trial by plaintiff was the testimony of Ammex's operations manager, Mr. Tacoma, who was proffered as an authority with respect to how Ammex calculated its selling prices for gasoline sold during the operative periods and whether the federal excise tax was inclusive therein. According to Mr. Tacoma, he employed a sales device called "keystoning" to arrive at retail gasoline selling prices whereby he allegedly *doubled* the unit or bulk cost of the gasoline *exclusive* of federal excise taxes.[16] Thereafter, he would "look to see" what the competitors at other nearby domestic gasoline stations were charging, then ultimately set Ammex's gasoline prices at some (unstated) amount (but presumably) within the range of those retail competitors.[17] Mr. Tacoma testified that he considered the prices of other domestic retail gasoline stations in Detroit as his only source for competitive price comparison.[18]

## IV. DISCUSSION

### A. Merits

In the earlier proceedings, on cross-motions for summary judgment, this court found that plaintiff sufficiently established standing as a matter of law under 26 U.S.C. §§ 6421(c) and 4221(a)(2) to proceed to trial. *Ammex, Inc.,* 52 Fed.Cl. at 311, 314. In

---

13. Before this court therein, plaintiff, by summary judgment motion, sought to recover the manufacturer's federal excise taxes that it paid to its gasoline and diesel fuel suppliers. On cross-motion for summary judgment, defendant challenged plaintiff's standing to pursue subject claim. This court denied plaintiff's motion and granted in part and denied in part defendant's motion, so holding that plaintiff had established standing to pursue its claim *only* as to 26 U.S.C. § 6421(c), but must proceed to trial due to a finding of genuine issues of material fact. *See also Ammex, Inc. v. United States,* 52 Fed.Cl. 555 ([May] 2002) (where this court denied a motion for reconsideration filed by plaintiff based upon its claim under the Export Clause).

14. Trial Tr. 345–62 (Nov. 20, 2002).

15. Trial Tr. 358:2–6, 23–25, 359:1–6 (Nov. 20, 2002).

16. Trial Tr. 395: 4–10 (Nov. 20, 2002). *But see Ammex, Inc.,* 52 Fed.Cl. at 316 (memorializing plaintiff's previous submission to this court that it relied upon a theory called "marginal analysis" to arrive at its retail gasoline prices, which the record shows that no such theory of pricing was proffered by plaintiff at the trial on the merits).

17. Defendant's Exhibit 10 also provides the deposition testimony of a Mr. Levesque who stated that he priced Ammex's fuel "maybe a nickel, maybe ten cents" below the prices of other domestic gasoline stations. *See* Levesque Dep. 50:20–21 (Jan. 17, 2001). The foregoing deposition testimony of Mr. Levesque, the president of Ammex, is corroborated by admissions contained in Plaintiff's Pretrial Memorandum at 12–13, Plaintiff's Post–Trial Brief at 13, and Joint Exhibit 1, Stipulation # 14.

18. Trial Tr. 389:15–24 (Nov. 20, 2002).

addition thereto, we denied plaintiff's motion for summary judgment on the ground that a material fact issue existed as to whether it passed-on the economic burden of the federal excise tax to its retail customers. *Id.* at 315–16.

At trial, Ammex argued that duty-free classification of its gasoline was *not* a statutory requirement to a finding of *exportation* of same by the court pursuant to §§ 6421(c) and 4221(a)(2). Instead, plaintiff reverted to a prior position of exportation under the Export Clause, and a new hybrid argument of the Export Clause and the duty-free statutes, 19 U.S.C. §§ 1555 and 1557. In the alternative, plaintiff averred that duty-free classification of its fuel was granted retroactively by the August 2000 Court of International Trade ("CIT") decision.[19]

Defendant, in response thereto, both prior to and during trial, raised the affirmative defense of issue preclusion as to any question of exportation, relying upon a July 2002 decision and order from the District Court in the Eastern District of Michigan.[20] Finally, upon being raised by the court *sua sponte*, both parties addressed the equitable issue of whether the tax was passed on by plaintiff to its customers.

Against this background, the issues thus to be decided herein are as follows:

(1) Whether issue preclusion, as raised by defendant as an affirmative defense, duly operates to foreclose the question of exportation;

(2) Whether this court can make a finding of exportation of Ammex's gasoline sales during the operative periods under §§ 6421 and 4221 absent duty-free classification; and

(3) Whether plaintiff, pursuant to 26 U.S.C. § 6416(a), has passed-on the economic burden of the federal excise tax to its customers through its gasoline prices, and is precluded thereby from eligibility to recover any payment from the government.

We will address each issue *seriatim.*

**B. Issue Preclusion**

Defendant raises the affirmative defense of issue preclusion as dispositive of the exportation issue before this court. As asserted by defendant, "[t]he rationale for the judicial doctrine of issue preclusion is that 'a party who has [previously] litigated an issue and lost should be bound by that decision and cannot demand that the issue be decided over again.'" Def. Supp. Mem. at 6–7 (citing *Mother's Restaurant Incorporated v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569 (Fed.Cir.1983)).

In April 2002, this court found that plaintiff had established standing under 26 U.S.C. § 6421(c) to proceed to trial. Subsequent thereto, on or about July 31, 2002, in the Eastern District of Michigan, the U.S. District Court decided issues similar to those leading to this court's April 2002 opinion, but for different tax periods.[21] Defendant, in its affirmative defense, specifically relies on the issue, as previously determined in this court: "Was gasoline sold by plaintiff for export, and, if so, was the gasoline exported before any other use?"[22]

This court answered the question in April 2002 in the affirmative,[23] while the District Court answered the same question in July 2002 in the negative.[24] The District Court based its reasoning therefor on its application of defendant's Revenue Ruling 69–150, 1969 WL 19385. Hence, as a threshold matter, not only had the exportation issue *previously* been decided *by this court* (COFC),

19. *See Ammex, Inc. v. United States,* 116 F.Supp.2d 1269 (CIT 2000).

20. *See Ammex, Inc. v. United States,* No. 00–CV–73388, 2002 WL 32065583 (E.D.Mich. July 31, 2002); *Ammex, Inc. v. United States,* No. 00–CV–73388, 2002 WL 31777584 (E.D.Mich. October 22, 2002) (denying plaintiff's motion for reconsideration).

21. *See Ammex, Inc. v. United States,* No. 00–CV–73388, 2002 WL 32065583 (E.D.Mich. July 31, 2002). The tax periods at issue before the District Court were the first two quarters of 1999.

22. *Ammex, Inc.,* 52 Fed.Cl. at 314; *Ammex, Inc.,* No. 00–CV–73388, slip op. at 17.

23. *Ammex, Inc.,* 52 Fed.Cl. at 314–15.

24. *Ammex, Inc.,* No. 00–CV–73388, slip op. at 20.

but we also held that Revenue Ruling 69–150 was inapposite to the fact circumstances.[25]

Unquestionably this court found that exportation did occur.[26] Defendant argues that because the factual issue of duty-free classification remained for trial, the exportation issue had not been finally decided by this court. Procedurally, however, in both court proceedings, the posture was that of cross-motions for summary judgment. In a summary judgment motion, the non-movant receives the benefit of having all factual inferences made in its favor. Therefore, by operation of the summary judgment device, the question of exportation, *i.e.*, whether exportation could occur under a mixed question, was answered with finality by this court.

It is clear beyond cavil that the exportation (and revenue ruling) question that was addressed by this court in April 2002 pre-dates the District Court decision of July 2002, rendering issue preclusion inapposite here. Any other finding would yield an awkward application of the doctrine.

We are, therefore, of the opinion that the issues in subject case are properly before us, the case is now ripe for final disposition inasmuch as trial has been held and concluded, and at this posture, issue preclusion is not a bar.

### C. Exportation under 26 U.S.C. § 4221(a)(2)

■ 26 U.S.C. § 6421(c) provides:

"Exempt purposes.—If gasoline is sold to *any person* for any purpose described in paragraph (2), (3), (4), or (5) of section 4221(a), the Secretary shall pay (without interest) to such person an amount equal to the product of the number of gallons of gasoline so sold multiplied by the rate at which tax was imposed on such gasoline by section 4081."

(emphasis added).

And, 26 U.S.C. § 4221(a)(2) reads:

"(2) for export, or for resale by the purchaser to a second purchaser for export, ... but only if such exportation or use is to occur before any other use."

The foregoing relevant portions of the operative statutes may be divided into three elements: (1) If gasoline is sold to any person, (2) for export, or for resale by the purchaser to a second purchaser for export (but only if such exportation or use is to occur before any other use), then (3) the Secretary shall pay to such person an amount equal to the product of the number of gallons of gasoline so sold multiplied by the rate at which tax was imposed on such gasoline by section 4081.

First, it is undisputed that gasoline was sold to Ammex by multiple suppliers[27] during the periods at issue. The irrefutable evidence of that fact is plaintiff's purchase invoices contained in the record (Def. Exs. 11 & 12) and the uncontested testimony that Ammex received on average two fuel deliveries per day (Trial Tr. 386:9–14).

Secondly, it is also undisputed that plaintiff *resold* said gasoline to persons at its gasoline fuel pumps, and those persons purchasing gasoline at Ammex's facility were undoubtedly destined for the Canadian border,[28] less than two (2) miles away. This fact is clearly corroborated by the following testimony of U.S. Customs Agent Blaine:

"Q  The Customs determined in 1993 that Ammex had provided for its West Lafayette Street duty-free store reasonable assurance that the merchandise it sold would be exported from the United States; isn't that correct?

---

25. *Ammex, Inc.,* 52 Fed.Cl. at 311–12.

26. *Ammex, Inc.,* 52 Fed.Cl. at 314.

27. BP Exploration & Oil Inc. and Amoco Oil Co., Pl.Ex. 15; Atlas Oil Co., Pl.Ex. 16, and Peerless Distributing Co., Pl.Ex. 17.

28. "During the tax periods in suit, Ammex sold gasoline to its customers destined for Canada at the West Lafayette Ammex Facility." Stipulation No. 9, Jt. Ex. 1 at 2.

A That is correct."

Trial Tr. 258:2–6 (Nov. 20, 2002).

"Q Customs has never changed that determination, has it, Mr. Blaine?

A No, they have not."

Trial Tr. 259:4–6 (Nov. 20, 2002).

Section 4221(a) does not define the word export, therefore absent a specific statutory definition, that word will be given its plain and ordinary meaning, to wit, the general definition of exportation is—"a severance of goods from the mass of things belonging to this country with an intention of uniting them to the mass of things belonging to some foreign country." *Swan & Finch Co. v. United States,* 190 U.S. 143, 145, 23 S.Ct. 702, 47 L.Ed. 984 (1903); 19 C.F.R. § 101.1. *See also* 26 C.F.R. § 48.0–2(a)(10), which states as follows: "The term *exportation* means the severance of *an* article from the mass of things belonging within the United States with the intention of uniting *it* with the mass of things belonging within some foreign country or within a possession of the United States." (emphasis added).

Vehicles entered Ammex's facility through controlled gates at toll booths which serve as an official U.S. Customs exit point, *i.e.,* the point-of-no-return, meaning anyone beyond that point must proceed out of the customs territory, and in this case, directly into Canada upon crossing the Ambassador Bridge.[29] Therefore, a vehicle purchasing gasoline at Ammex could *only* proceed to Canada. When the vehicles leave this country from the exit point at Ammex's facility in Detroit, and cross the Canadian border, whatever is being exported becomes united with the mass of goods in Canada, *i.e.,* to be used and consumed therein. Since the general definition of exportation *only requires* that goods be severed from the United States and united with things belonging to some foreign

country, then exportation has in fact occurred. 26 C.F.R. § 48.0–2(a)(10), *supra.*

Whether exportation of the gasoline occurred before any other use is here presumed by the court in the affirmative.[30] Defendant argues that "full and complete use," as a matter of law, occurs upon deposit of the fuel into the tank of the vehicle.[31] However, there is not one scintilla of evidence in the record that vehicles arrived at Ammex's fuel pumps with completely empty fuel tanks, such that there was no fuel contained therein to propel the vehicles fewer than two miles to the Canadian border. Absent any such evidence or expert testimony on the manner of vehicle fuel consumption to the contrary, the court finds that the gasoline purchased at Ammex was neither used nor consumed by the vehicles during their short journey (less than two miles) to the Canadian border, *i.e.,* prior to exportation. Therefore, we hold that plaintiff clearly sold said fuel to a "second purchaser for export ... before any other use." 26 U.S.C. §§ 6421(c) and 4221(a)(2).

Any additional requirement that the fuel be bonded and/or classified as duty-free—is neither imposed nor required under § 4221(a)(2), is outside of a plain reading of the statute, and is therefore irrelevant to determining whether plaintiff satisfies the indispensable elements of the statute. For that reason, we do not reach those arguments made by the parties regarding duty-free classification. A plain reading of the statute does not add any such additional burden on the plaintiff to qualify under the statutory provisions. Plaintiff therefore satisfies the first two elements under §§ 6421(c) and 4221(a)(2) necessary to entitle it to receive payment from the Secretary under the third and final element, whereby the stipulated amount due to plaintiff for the amount

---

**29.** The following testimony from Customs Agent Blaine is corroborative thereof:

"Q Ammex's duty-free store on West Lafayette Street is an exit point from the United States; isn't that correct, Mr. Blaine.
A That is correct."

Trial Tr. 256:6–9 (Nov. 20, 2002).

**30.** *See Ammex, Inc.,* 52 Fed.Cl. at 314 (deciding "the question ... whether fuel pumped directly

into a vehicle's fuel tank and driven [fewer] than two miles to the boarder crossing constitutes use (of the *totality of the purchased fuel* [or any part thereof]) prior to exportation. This court answers that question in the negative.").

**31.** *See* Trial Tr. 60:4–7 (Dec. 19, 2002) (during defendant's closing argument).

of tax imposed under section 4081 is $3,302,486.

### D. Passing-on the Tax

■ As a matter of fundamental jurisprudence, this court raised the question, *sua sponte*, of the passing-on the tax in its April 10, 2002 opinion.[32] This gave both parties a fair opportunity to address at trial said operative issue which the court deems to be outcome determinative. Plaintiff responded by categorically stating that (i) the passing-on issue was not applicable to § 6421(c), and (ii) even if it were, it has not done so. The first prong of Ammex's argument, that § 6416(a) is inapposite here, is grounded in its hospitable reading of § 6421(c) where it argues that no such language appears in the statute, and further cites to case law allegedly proclaiming that courts are not to impose equity considerations on tax statutes absent express language therein.

In its response to plaintiff, the court will demonstrate that a plain reading of the statutory language of 26 U.S.C. § 6421(g) requires application to paragraph (c), whereby the former incorporates by reference the collateral application of 26 U.S.C. § 6416(a). Found in section 6416(a) is an express *no passing-on* equitable provision. Hence, because the equitable provision relied upon by this court is codified in section 6416(a), there is no need to address plaintiff's case law arguments that courts should not themselves impose equity where none is expressly provided by statute.

The issue before us, at first blush, appears to be one of first impression involving the application of sections 6421 (paragraphs (c) and (g)) and 6416(a). We begin our analysis by employing basic canons of statutory construction. The necessary starting point in every case involving statutory construction is the language of the statute itself. *Bread Political Action Comm. v. Federal Election*

*Comm'n.*, 455 U.S. 577, 580, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982). It must be presumed that the legislature used words in their "known and ordinary" significance. *Old Colony R.R. Co. v. Commissioner,*[i] 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484 (1932). Therefore, unless statutorily defined otherwise, words will be given their plain, ordinary, contemporary, and common meaning. *Burns v. Alcala,* 420 U.S. 575, 580–81, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975).

Recall that the claim provision relied upon by plaintiff reads as follows:

"Exempt purposes.—If gasoline is sold to *any person* for any purpose described in paragraph (2), (3), (4), or (5) of section 4221(a), the Secretary shall pay (without interest) to such person an amount equal to the product of the number of gallons of gasoline so sold multiplied by the rate at which tax was imposed on such gasoline by section 4081."

26 U.S.C. § 6421(c) (emphasis added). In that connection, plaintiff has embraced paragraph (2) of 4221(a) as the apposite exempt purpose.[33] However, a comprehensive reading of the proper application of § 6421(c) does not end there. " 'The cardinal principle of statutory construction is to save and not to destroy.' [citation omitted] It is [therefore] our duty 'to give effect, if possible, to every clause and word of a statute.' [citation omitted]." *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955). To do so, in the case here at bar, we must continue reading § 6421 in its entirety to arrive at paragraph (g) which is *prima facia* instructive as to the propriety of any claims made under section 6421; thus, it is further provided therein as follows:

"(g) Applicable laws.—

(1) In general.—All provisions of law, including penalties, applicable in respect of the tax imposed by section 4081 shall, inso-

---

**32.** *See United States v. Jefferson Electric Mfg. Co.,* 291 U.S. 386, 400, 54 S.Ct. 443, 78 L.Ed. 859 (1934), wherein the U.S. Supreme Court opined that—"We cannot assent to the view that a court may give a judgment awarding the taxpayer a refund without inquiring whether he has borne the burden of the tax or has reimbursed himself by collecting it from the purchaser."

**33.** "[F]or export, or for resale by the purchaser to a second purchaser for export, . . . but only if such exportation or use is to occur before any other use." 26 U.S.C. § 4221(a)(2).

far as applicable and not inconsistent with this section, apply in respect of the payments provided for in this section to the same extent *as if such payments constituted refunds of overpayments of the tax so imposed.*

(2) Examination of books and witnesses.— *For the purpose of ascertaining the correctness of any claim made under this section,* or the correctness of any payment made in respect of any such claim, the Secretary shall have the authority granted by paragraphs (1), (2), and (3) of section 7602(a) (relating to examination of books and witnesses) *as if the claimant were the person liable for the tax."*

26 U.S.C. § 6421(g) (emphasis added).

In effect, § 6421(c) permits the recovery of section 4081 manufacturer's excise tax by a non-taxpayer in the form of a payment from the Secretary of the Treasury. We stated in our earlier opinion of April 2002 that § 6421(c) appears to contemplate precisely the plaintiff herein (Congress understanding that manufacturers may actually pass-on the cost of the excise taxes imposed upon them, although not required by statute). Even with that in mind, Congress did not intend, and so did not subscribe, section 6421(c) to be a free-for-all provision as evinced by the inclusion of paragraph (g). Said paragraph clearly imposes some level of scrutiny upon any payment claimed under § 6421.

We will examine paragraph (g)(1) in two phases: first, the general mandate that "[a]ll provisions of law, including penalties, applicable in respect of the tax imposed by section 4081 shall ... apply in respect of the payments provided for in this section to the same extent *as if such payments constituted refunds of overpayments of the tax so imposed,"* and, secondly, the *proviso* or exception "insofar as applicable and not inconsistent with this section" (emphasis added).

The general or broad mandate of subsection 6421(g)(1) instructs that payments sought under section 6421 are to be treated as though they are refunds of overpayments of tax imposed *under section 4081* such that all provisions of law affecting said refunds shall apply. Note that section 4081 falls under the rubric of chapter 32, manufactur-

ers taxes. Now observe that 26 U.S.C. § 6416(a) affects *any* refund sought under said chapter 32, thus, it provides as follows:

"Condition to allowance.—

(1) General rule.—No credit or refund of any overpayment of tax imposed by chapter 31 (relating to retail excise taxes), or chapter 32 (manufacturers taxes) shall be allowed or made unless the person who paid the tax establishes, under regulations prescribed by the Secretary, that *he*—

(A) *has not included the tax in the price of the article with respect to which it was imposed and has not collected the amount of the tax from the person who purchased such article;*

(B) has repaid the amount of the tax to the ultimate purchaser of the article;

(C) in the case of an overpayment under subsection (b)(2) of this section—

(i) has repaid or agreed to repay the amount of the tax to the ultimate vendor of the article, or

(ii) has obtained the written consent of such ultimate vendor to the allowance of the credit or the making of the refund; or

(D) has filed with the Secretary the written consent of the person referred to in subparagraph (B) to the allowance of the credit or the making of the refund."

26 U.S.C. § 6416(a) (emphasis added).

Since subsection 6421(g)(1) tells us that payments sought under section 6421 are to be treated as though they were refunds of overpayments of tax imposed *under section 4081,* and § 6416(a) governs *any* refunds of overpayments of tax imposed *under section 4081,* then by deduction a plain reading of the language of § 6421(g)(1) must incorporate by reference section 6416(a), unless § 6416(a) is somehow inapplicable or inconsistent with section 6421. We now turn to the exception—"insofar as applicable and not inconsistent with this section"— § 6421(g).

Plaintiff says § 6416(a) is not applicable at bar because it applies only to the "person who paid the tax," whereas plaintiff here concedes that it is *not* the person who paid the tax, *i.e.,* the taxpayer. Most assuredly, a logical reading of subsection 6421(g) places

the 6421(c) claimant in the shoes of a taxpayer for purposes of proving the validity of a payment claim made thereunder. Congress was no doubt aware that the 6421(c) claimant would not be the taxpayer, yet it has placed said claimant in no better position than that of a taxpayer when it comes to claiming a tax refund.[34] To be sure, paragraph (2) of 6421(g) further states that—

> "*For the purpose of ascertaining the correctness of any claim made under this section,* or the correctness of any payment made in respect of any such claim, the Secretary shall have the authority granted in … section 7602(a) (relating to examination of books and witnesses) *as if the claimant were the person liable for the tax.*"

26 U.S.C. § 6416(g)(2) (emphasis added).

Again, when drafting paragraph (g)(2), Congress was concerned with two things: (1) ascertaining the correctness of a claim, and (2) treating the claimant as though it were the person liable for the tax, *i.e.,* the taxpayer—*ergo,* not placing the § 6421(c) claimant in any better position than a taxpayer claiming a refund. It is therefore irrefutable that the "taxpayer" language of 6416(a) does *not* operate to render 6421(g) inapplicable here.

Likewise, and for the same reasons discussed *supra,* § 6416(a) cannot be said to be inconsistent with section 6421(c). A brief look at the legislative history of § 4081 reveals that Congress was concerned with passing-on the tax when refunds or credits were sought thereunder—

> "The tax is not imposed on refined petroleum products exported by the person otherwise liable for the tax or which are to be sold for export by the purchaser or a subsequent purchaser. …

A credit or refund (without interest) is payable to the person who paid the tax if the tax is imposed on a product which is used or sold for an exempt use. *Because the seller generally passes the tax through to the purchaser, no credit or refund is allowed unless* the person who paid the tax establishes that (a) he or she has repaid or agreed to repay the person selling the product for or using the product in an exempt use (*e.g.,* the person exporting the product), or (b) he or she has obtained the written consent of such person to the allowance of the credit or refund. *Under certain circumstances, a refund may be made directly to the exporter or user.*"

H.R. No. 101–881, at 294 (1990), *reprinted in* 1990 U.S.Code Cong. and Admin. News 2296 (emphasis added).

Congress' explanation *supra* found in the legislative history of section 4081 to some extent reads like an excerpt from the language used in § 6416(a). That Congress is here concerned with unjust enrichment is patently clear. Plainly Congress seeks to prevent a person who has passed-on the tax from later claiming a refund unless the claimant has repaid the tax to, or the refund is consented to by, the real party in interest, to wit, the person who actually bore the tax burden.[35] By including the language: "*Under certain circumstances, a refund may be made directly to the exporter or user,*" Congress attempts to reach the last possible party in the transaction chain who may ultimately bear the tax burden—the ultimate purchaser.[36] For this reason, § 6416(a) cannot be said to be inconsistent with § 6421(c)—a statute authorizing a section 4081 refund.

**34.** " 'It is well established that taxpayers have the burden of proof in tax refund cases.' " *American Airlines, Inc. v. United States,* 204 F.3d 1103, 1108 (Fed.Cir.2000) (quoting *Jones v. United States,* 178 Ct.Cl. 16, 371 F.2d 442, 446 n. 9 (1967)). "[T]he taxpayer has the burden of establishing entitlement to the specific refund amount claimed." *Bubble Room, Inc. v. United States,* 159 F.3d 553, 561 (Fed.Cir.1998).

**35.** "The purpose of this provision [then, 26 U.S.C. § 3443(d)(1), now 26 U.S.C. § 6416(a)] is to prevent the unjust enrichment of a taxpayer who has not suffered the burden of the tax, but

has succeeded in passing the tax on to the ultimate purchaser." *Vogel v. Knox,* 147 F.Supp. 10, 13 (D.Minn.1957) (citation omitted).

**36.** "This section [6416(a)] ensures that when parties other than the taxpayer actually incur the cost of the tax that they receive the benefit of the refund." *Tenneco, Inc. v. United States,* 17 Cl.Ct. 345, 349 (1989), *aff'd,* 899 F.2d 1227 (Fed.Cir. 1990) (citing *United States v. Jefferson Elec. Mfg.,* 291 U.S. 386, 402, 54 S.Ct. 443, 449, 78 L.Ed. 859 (1934)).

Moreover, the legislative history of section 6421 shows that Congress intended a plethora of other (tax) code sections having to do with refund claims to apply to subject section 6421 through paragraph (g) [37]—

"Under this provision (*to mention some, but not all, of the provisions which will apply*) sections 6514 (relating to credits or refunds after period of limitations), 6532 (relating to periods of limitation on suits), 7405 (relating to action for recovery of erroneous refunds), and 7422 (relating to civil actions for refunds by taxpayers) of the 1954 code apply."

S. Rep. Nos. 1965 and 2054 (1956), Conf. Rep. No. 2436 (1956), *reprinted in* 1956 U.S.Code Cong. and Admin. News 2883 (emphasis added). Congress having spoken, hence, subsection 6416(a) cannot be held to be *inconsistent with section 6421.* We find therefore that the *no passing-on* provision of 6416(a) is wholly applicable to and dispositive of plaintiff's § 6421(c) payment claim.

### 1. Burden of proof

Under Ammex's alternate contention, *i.e.,* that even if the § 6416(a) no passing-on provision is applicable, it has *not* done so, we hold that the plaintiff has the burden of proof while the defendant's only (initial) burden is to raise the defense. *Milwaukee Safeguard Ins. Co. v. Selcke,* 324 Ill.App.3d 344, 257 Ill.Dec. 691, 754 N.E.2d 349, 358 (2001) ("The party challenging a taxpayer's entitlement to a refund, in this case the defendants, undoubtedly bears the burden of raising the pass-on defense. Once said defense is raised, however, it becomes the taxpayer's burden to [go forward with the evidence and] show that it did not pass on the tax to another party.") (citation omitted). Defendant, in response to this court's notice to the parties in its April 2002 opinion, formally raised the passing-on defense in a timely manner.

In *Gumpert v. United States,* 155 Ct.Cl. 721, 296 F.2d 927 (1961), the federal excise tax claim involved § 4262, an exception to the tax imposed under § 4261, and required the application of § 6415(a),[38] a provision similar to § 6416(a). The *Gumpert* court held: "Since it is our view that plaintiffs have neither borne the economic burden of the tax, nor refunded the amounts collected to their customers, nor obtained consents from those who did bear the burden, the conclusion is clear that plaintiffs are without standing to sue, and the petition will be dismissed." *Id.* at 726, 296 F.2d 927.

*Gumpert* is later cited to by *Epstein v. United States,* 174 Ct.Cl. 1158, 1174, 357 F.2d 928 (1966), which also discusses the paramount requirement to prove that the tax was not passed-on before a claim for refund of excise taxes can be had. "In such circumstances, recovery may be had only if plaintiff can show that he himself had borne the economic burden of the taxes by paying them out of his own pocket and had not collected them from members." *Id.* Thus, the critical, outcome-determinative affect of the passing-on issue is irrefragable.[39]

Moreover, according to *Tenneco, Inc. v. United States,*[40] 26 U.S.C. § 6416(a) requires proof by at least a *preponderance* of the evidence. *But see Andrew Jergens Co. v. Conner,* 125 F.2d 686, 689 (6th Cir.1942) (applying a heightened "clear and decisive" standard). Arguably, I.R.C. § 7602 referenced in subsection 6421(g)(2) prescribes a level of scrutiny which may operate to heighten the standard of proof to "clear and decisive," as the Sixth Circuit held in *Conner.* When under review by a court, any burden of

---

37. *Compare State of New York v. United States,* 851 F.Supp. 50, 51 n. 1 (N.D.N.Y.1994) (The District Court relied upon 26 U.S.C. § 6421(g)(1) to establish subject matter jurisdiction, pursuant to 28 U.S.C. § 1346(a)(1), over a tax refund claim.).

38. "(a) Allowance of credits or refunds.—Credit or refund of any overpayment of tax imposed by section 4251, 4261, or 4271 may be allowed to the person who collected the tax and paid it to the Secretary if such person establishes, under such regulations as the Secretary may prescribe, that he has repaid the amount of such tax to the person from whom he collected it, or obtains the consent of such person to the allowance of such credit or refund."

39. *See also Jefferson Electric,* 291 U.S. at 400, 54 S.Ct. 443.

40. 17 Cl.Ct. 345, 350 (1989), *aff'd,* 899 F.2d 1227 (Fed.Cir.1990).

proof, however, that is prescribed as due to the Secretary pursuant to I.R.C. § 7602, is also due to the court. *Jefferson Electric,* 291 U.S. at 398, 54 S.Ct. 443. The burden of proof on a taxpayer to show entitlement to a tax refund is both the burden of going forward and the burden of persuasion. *Danville Plywood Corp. v. United States,* 899 F.2d 3, 7–8 (Fed.Cir.1990).

### 2. Passing-on Case Law

This court finds *Tenneco, Inc. v. United States* to be a persuasive guide or standard to apply in determining whether an excise tax has been passed-on through the selling price, not only as to the law, but also as to the facts. Plaintiff, understandably, disagrees, contending that to apply *Tenneco* to the case *sub judice* is to compare apples with oranges. However, plaintiff is mistaken as to the operative facts and law. Thus we are constrained to hold that *Tenneco* has binding authority herein.

The *Tenneco* plaintiff manufactured motor vehicle parts and accessories whereby the parts were generally subject to a manufacturer's excise tax imposed under 26 U.S.C. § 4061 (1982) (repealed 1984). For the periods at issue therein, the plaintiff mistakenly paid excise tax on exhaust system parts which were otherwise exempt from tax. Upon plaintiff's timely filing for a refund of the excise taxes, the court applied 26 U.S.C. § 6416(a) as the statute governing the plaintiff's entitlement to a refund claim. As fully discussed, *supra*, § 6416(a) has a no passing-on provision for which the *Tenneco* court defined several operative factors as a guide for determining whether passing-on occurred.

Both from a legal as well as factual posture, *Tenneco* is a case on point. In *Tenneco,* a manufacturer's excise tax was imposed under § 4061 (repealed). In the case at bar, the manufacturer's excise tax was imposed under § 4081. In each case a *refund* of the excise tax is being sought. Section 6416(a) governs refunds for all chapter 32 manufacturer's excise taxes, §§ 4061 and 4081, inclusive.

The obvious distinction between the *Tenneco* case and the case before us is that the plaintiff Ammex is not the manufacturer/taxpayer, and therefore established standing under a separate statute, § 6421, which provides a venue for a non-manufacturer/taxpayer to, in effect, claim a § 4081 tax refund. Said non-taxpayer provision, however, incorporates (by reference) all other provisions applicable to § 4081 refund claims, hence, § 6416(a). Said distinction, therefore, is one without a significant difference respecting the application of § 6416(a) to all chapter 32 manufacturing excise tax claims for refunds.

### 3. *Tenneco* Factors for Determining Passing-on

■ Factors identified in *Tenneco* for determining whether passing-on occurred begins with an analysis of the method used for setting retail prices, to wit, cost-based pricing or market-based pricing.

"A taxpayer's method of setting prices directly affects the nature of proof necessary to establish that those prices lacked an excise tax component. A manufacturer may base its prices either on market prices—competitive pricing—or on its production costs plus a profit margin—cost-based pricing. In general terms, when a manufacturer uses cost-based pricing, the court must ascertain if excise taxes are one of the cost components of the final price. See, *e.g., Clauson Mfg. Co. v. United States,* 74–2 U.S. Tax Cas. (CCH) ¶ 16,153 at 85,901, 1974 WL 731 (W.D.Ky.1974). When a manufacturer uses competitive pricing, the court must ascertain if the market prices include an excise tax component. [citations omitted].... Again, plaintiff has the burden of providing evidence to answer the question which applies to its pricing method."

*Tenneco,* 17 Cl.Ct. at 350.

Plaintiff maintains that it used a cost-based pricing method. In support thereof, it offered at trial the testimony of Mr. Tacoma, Ammex's store operations manager during the periods at issue. Relevant portions of Mr. Tacoma's testimony are as follows:

"Q Tell the Court how you went about setting prices for motor fuel.

A When we get our motor fuel in, the fuel ordering department would notify our accountant as to the current selling price of motor fuel for that date, and we would take the bulk cost of that motor fuel, and that's what he would give me, and then I would take that pricing, I would double it, which would give me my overall cost with my profit margin.

And at that time what I would do is then I would look to see what the surrounding gas stations in our area, within a block we had a Mobil station, within two blocks we had a BP station, within another couple of blocks we had another Mobil station, which were all on 4th Street here in Detroit close to our facility, we would look to see what their prices were.

Based on that we would look to see what kind of profit margin we could get by using their price guideline as our guidelines for how we were going to price our fuel."

Trial Tr. 389:6–24 (Nov. 20, 2002).

"Q Did your bulk cost include taxes?

A No, they did not.

Q What is included in bulk cost?

A Bulk cost would be the line—there is a line item that they say is this is how many gallons of fuel you are buying, and this is how much we are going to charge you for that cost. This is how much per gallon that fuel is going to cost you."

Trial Tr. 390:6–7, 16–21 (Nov. 20, 2002).

"Court: What was the rationale for simply doubling the price?

Witness: That is a basic standard for sales in almost every location. Keystoning is what they basically call it in retail sales. In keystoning what they basically do is a store gets in a product, they take that product and they try to double it. In other words, they try to get the cost of the product times itself back in the cost of the product.

Court: What if after doubling the price you find that you haven't covered your cost? Have you had occasion to run into that?

Witness: We have had that problem, yes.

Court: And what would you then do?

Witness: We would either raise the price and sometimes we left it.

Court: And what criterion did you use or criteria did you use in order to further raise the price?

Witness: The criteria to further raise the price?

Court: Yes, to further raise the price.

Witness: To further raise the price. It would be basically what we could get out in the market.

Court: But would you always do whatever is necessary to cover your costs?

Witness: In most cases, yes."

Trial Tr. 395:2–25, 396:6–8 (Nov. 20, 2002).

"Q After you double the bulk cost, Mr. Tacoma, you testified that you check competitors' prices. How did you acquire information on competitors' prices?

A We would basically actually have someone, we had a running log that we would keep, drive by. We would check the prices coming in. We would check the prices in the local suburbs. As someone would come to work, he noticed that on the corner gas station this is what they were charging today. In our particular area, we would have an employee who would actually go out and collect prices for us."

Trial Tr. 391:15–25 (Nov. 20, 2002).

"Q: Who were your competitors with respect to the sale of motor fuel?

A: Basically, I had two Mobil stations and a British Petroleum station all within, you know, easy access to the bridge."

Trial Tr. 392:1–5 (Nov. 20, 2002).

That plaintiff alleges it used a pricing method called "keystoning," where it doubled its bulk or unit cost, exclusive of taxes, without more, hardly proves that the excise taxes were *not* included in its retail sales price. Obviously for a retailer to use simple keystoning, *i.e.*, doubling its unit cost to arrive at

a retail sales price, only shows that the retailer is confident that doubling the unit cost is sufficient to cover its other costs and provide a profit. Therefore, to say Ammex simply doubled the unit cost of gasoline as its pricing methodology, does not, *ipso facto*, establish, by a preponderance of the evidence, that the excise tax was *not* a cost component that was covered by the doubling.

In other words, plaintiff's apparent afterthought testimony that "I would double it [the bulk cost], which would give me my overall cost with my profit margin," provides to the court no creditable proof beyond plaintiff's self-serving word that the excise taxes were not included in its "overall cost."

Clearly plaintiff failed to go forward with the evidence, *i.e.*, burden, to establish and demonstrate for the court the application of its price computation scheme for its retail gasoline sales. In that connection, the record only contains self-serving and hospitable uncorroborated testimony.[41] Ammex offered no books, workpapers, schedules, logs, or other records of any kind, and responded to defendant's interrogatory during discovery that no records exist. This statement, the non-existence of records, clearly appears to be inconsistent with the sworn testimony of Mr. Tacoma where he emphatically testified that—"...we had a running log that we would keep." No such running log was ever adduced into evidence, nor did plaintiff explain its failure to do so.

In *Clauson Mfg. Co., Inc. v. United States*, 74–2 U.S. Tax Cas.(CCH) ¶ 16,153 at 85,901, as cited to in *Tenneco supra*, the "[p]laintiff did not favor the Court with any written documentary evidence to substantiate his claim. His claim is unsupported except for his bare allegations and conclusions." *Id.* "As indicated, plaintiff had the burden of proving that the cost of the tax was not a part of or covered by the price charged." *Id.* ¶ 16,154 at 85,902.

Plaintiff appears content with the contention that Ammex's bulk cost for fuel, when doubled, *approximates* the selling price of that fuel. However, the record is replete with evidence where, for example, Ammex's unit cost was fifty-four cents and another forty cents was attributable to state and federal excise taxes, and plaintiff's selling price well exceeded the sum of these amounts. Def. Exs. 11–14. There were many such examples that this court was hard-pressed to find an instance where this was not the case. Hence, to the extent that plaintiff purports that its unit cost when doubled "approximates" the selling price of its fuel, it also confirms the fact that plaintiff's selling price covered its total cost for the fuel inclusive of all excise taxes.[42] *Id.* Therefore plaintiff's *approximation* assertion merely begs the question.

Plaintiff's vague and nebulous pricing methodologies,[43] unsupported by one scintilla of documentary evidence, compels this court to hold that plaintiff has failed to carry its burden establishing that it did *not* pass on the tax burden to its retail customers. Thus, Ammex's so-called cost-based pricing methodology, on this record, appears to be nothing more than an afterthought. Therefore, we hold that plaintiff has totally failed to carry its burden with mere uncorroborated self-serving testimony.[44]

---

**41.** In *Tenneco*, the plaintiff's pricing testimony was buttressed, thus: "Mr. Charles Lueke, a current Tenneco executive, corroborated Mr. Ince's testimony about plaintiff's price-setting methods by *actually replicating the pricing* of a few products." *Tenneco*, 17 Cl.Ct. at 347 (emphasis added).

**42.** Also, it is interesting to note that plaintiff attached to its post-trial brief a document purporting to establish an alleged "Rent Expense" charged against its average sales price for gasoline for each of the periods at issue. It was presumably offered in an effort to rebut defendant's contention of plaintiff's profitability. We find plaintiff's late attempt to submit an otherwise evidentiary document with its post-trial brief referenced as "Exhibit I" to be defective as plaintiff rested its case-in-chief on November 21, 2002. This submission therefore cannot be considered as proof that plaintiff had additional cost not covered by its alleged "keystoning" that affected its profitability.

**43.** *See supra* text accompanying note 16.

**44.** *Vogel*, 147 F.Supp. at 14 ("Considerations of policy and sound administration compel that a taxpayer's naked assertion be held insufficient to satisfy the requirements of Sec. 3443(d)(1) [6416(a)'s predecessor] when it is apparent that other more inherently reliable evidence could have been produced or when there has been no

The court assigns *de minimis* weight to the testimonial evidence given respecting the so-called cost method.[45] Given the lack of records and the failure to demonstrably re-create/illustrate a bona fide pricing methodology, the more plausible finding is that a market, and not a cost, basis pricing methodology was actually used.

Far more convincing to this court is the testimony of Mr. Tacoma and the deposition testimony of Mr. Levesque *infra* (offered in Defendant's Exhibit 10) which reveal a competitive or market-based pricing scheme rather than a cost basis.

From Defendant's Exhibit 10, relevant portions of the January 17, 2001 deposition testimony of Mr. Levesque are as follows:

"Q. Okay. Would you describe for me how Ammex determines what to charge its customers, starting from the price that it paid on that particular invoice."

Levesque Dep. 39:2–4.

"A. Ammex is a duty-free operation. I don't look at the cost the way you are looking at it, I believe. I look at cost without the taxes. How do I determine my price? I already know that I am a duty-free and tax-free operation. I look at my neighbor that is domestically priced at a dollar thirty, for instance. I will price it at a dollar twenty-five, period. That's my method of pricing."

Levesque Dep. 40:11–18.

"Q. Do you have any specific examples for me that you can show me, based on any records that you might have, where the fuel that you sold was sold at a price that was less than the invoice price that Fleet gave you?

A. I don't have any records with me.

Q. Do any such records exist?

A. It's possible."

Levesque Dep. 44:2–8.

"Q. I ask you right now, as you sit here today, can you point to me one instance where the sale of that fuel was less than—the price charged at Ammex's pump was less than the total cost to Ammex for that fuel?

A. I don't have all these records in front of me but it is entirely possible. The way I price is I look at my neighbor. He's sitting at a dollar thirty, for instance. I want to be competitive. I have a definitive market. They have to be international travelers. I price it at maybe a nickel, maybe ten cents under.

I don't even really care, really, where I'm sitting at on my costs, because I know for a fact that my neighbor, that's not a duty-free operator, if he's sitting at a dollar thirty, that includes tax. He is liable for tax. He must collect tax. I don't. So whatever he's paying is margin for me."

Levesque Dep. 50:11–25, 51:1–3.

"Q. How do you know that he has tax included in there?

A. Because he goes to jail if he doesn't.

Q. Or he goes out of business?

A. That's right. But I don't look at one Joe. I look at a bunch of Joes. A dollar thirty-five, a dollar thirty-six, a dollar thirty-seven. I'm going to go a nickel lower than the lowest guy in town. He's sitting at a dollar thirty-five, I'm going to go with a dollar thirty. I know I'm safe because I have no taxes."

Levesque Dep. 54:14–23.

Plaintiff attacks defendant's reliance on Mr. Levesque's sworn statements, professing that Mr. Levesque was not the store manager during the periods in suit. It was Ammex, however, that specifically referenced

---

showing that competent corroborative evidence is unavailable.").

**45.** In *Gumpert,* the court criticized that "[T]he only evidence in the instant case that plaintiffs have borne the economic burden of the tax is a naked allegation by the plaintiffs that they carried the tax as an expense of doing business, hence they paid the tax. The evidence does not substantiate this contention." 155 Ct.Cl. at 724, 296 F.2d 927.

Mr. Levesque's deposition testimony as "[d]ocuments describing, reflecting, setting forth, establishing, or otherwise substantiating the pricing method used." Def. Ex. 8. Plaintiff at trial raised no objection, as to relevance or otherwise, respecting Defendant's Exhibits 8 and 10. Instead, plaintiff held out Mr. Levesque as a person with knowledge of Ammex's pricing during the periods in suit. Def. Ex. 8.

Defendant's Exhibit 8, plaintiff's interrogatory response, provides in pertinent part:

"20. Describe in detail the method used by Ammex to set its prices for gasoline at its facility at the Ambassador Bridge during the periods in suit. In responding, please identify all persons with knowledge o[f] these facts and identify all documents describing, reflecting, setting forth, establishing, or otherwise substantiating the pricing method used.

Plaintiff identifies the following persons with knowledge of the facts regarding Ammex's method for pricing gasoline at its facility at the Ambassador Bridge during the periods in suit:

Charles Gutwald

Controller of Ammex during the periods in suit

. . .

Robert S. Tacoma

Store Manger of Ammex during the periods in suit

. . .

Francois Levesque

Store Manager of Ammex from approximately January 2000—October 2000, President of Ammex from October 2000 to the present

. . .

Documents describing, reflecting, setting forth, establishing, or otherwise substantiating the pricing method used are as follows:

. . .

Pages 39–54 of the deposition of Francois Levesque taken in proceedings regarding a similar matter in the Federal Court for the Eastern District of Michigan."

Based in part on the forgoing, the court makes the following findings of fact in relation to Mr. Levesque: (1) he was Ammex's store manager between January 2000 and October 2000, (2) he is Ammex's current president which implies that he has knowledge of key on-going areas of operations both past and present, and (3) both as store manager and president he employed the same market-based method to compute prices as used by Ammex during the periods at issue, in the absence of any allegation by Ammex that Mr. Levesque deviated from previous pricing practices or in any way created new pricing practices.

Observe, if you will, the contradiction in the testimony of Mr. Tacoma. Initially, you will note that he testified, *supra*, that they used the bulk cost method in arriving at Ammex's retail price. This process, "keystoning," consists of simply doubling its cost (excluding all taxes). Thereafter, he testified that they would look to see what neighboring gas stations' retail prices were and then see what kind of profit margin they could get "by using their prices." Indeed, a comparison of Tacoma and Levesque testimony shows the same manner of reliance on a competitive pricing practice rather than a cost pricing strategy as follows:

"We would basically actually have someone, we had a running log that we would keep, drive by. We would check the prices coming in. We would check the prices in the local suburbs. As someone would come to work, he noticed that on the corner gas station this is what they were charging today. In our particular area, we would have an employee who would actually go out and collect prices for us."

Tacoma Trial Tr. 391:18–25 (Nov. 20, 2002).

"That's right. But I don't look at one Joe. I look at a bunch of Joes. A dollar thirty-five, a dollar thirty-six, a dollar thirty-seven. I'm going to go a nickel lower than the lowest guy in town. He's sitting at a dollar thirty-five, I'm going to go with a dollar thirty . . . ."

Levesque Dep. 54:17–22 (Jan. 17, 2001).

The foregoing testimony clearly establishes deliberate tracking and reliance on

market prices, rather than cost prices, at a level far beyond a mere passing glance or observation. In that regard, competitive/market prices admittedly contemplated the inclusion of all taxes in its retail prices.

Plaintiff, however, points to Joint Exhibit 1 as proof that it did *not* include excise taxes in its retail gasoline prices. Paragraph 14 thereof reads as follows:

> "During the periods in suit, the gasoline prices charged by Ammex at its West Lafayette facility were based upon its *competitor's* prices. Plaintiff attempted to maximize gross revenues by underselling its competitors by about 5 to 10 cents per gallon. In setting these prices, Ammex did not base its prices on the amounts of Federal and State taxes imposed thereon."

Jt. Ex. 1 at 3 (emphasis added).

In the parties' respective arguments regarding the subject stipulation at paragraph 14, defendant emphasizes the language favorable to it, to wit, the first two sentences, while plaintiff stresses the last sentence. Notwithstanding the apparent incongruence, the parties will not be allowed to stipulate this court into error. We will consider the stipulation in conjunction with the totality of the evidence before us.

First, as to the reliability of sentence number one, plaintiff has admitted to competitive pricing via Mr. Tacoma's testimony at trial and Mr. Levesque's deposition testimony. As to the second sentence, while Mr. Tacoma did not testify as to a specific amount by which Ammex would attempt to undersell its competitors, Mr. Levesque testified to maybe five or ten cents per gallon. Finally, the last sentence in the stipulation is yet another naked assertion by plaintiff. Not only is it uncorroborated, it is also unhelpful to plaintiff on another ground because to say "Ammex did not *base* its price on the ... taxes imposed," is not to say that the taxes were not *included* in its final retail selling price. In short, we will hasten to hold that the last sentence is totally inconsistent with the record evidence.

As for using a cost-based method of price setting, exclusive of the cost of the excise taxes, plaintiff Ammex has made "a series of conclusory denials without factual support." *United States v. Prince,* 348 F.2d 746, 748 (2nd Cir.1965).[46] "[B]oth the duty of bringing forth evidence and the burden of persuasion is on the plaintiff." *Fuller Brush Co. v. United States,* 262 F.Supp. 989, 993 (D.Conn. 1966). "If the taxpayer has borne the burden of the tax, he readily can show it; and certainly there is nothing arbitrary in requiring that he make such a showing. If he has shifted the burden to the purchasers, they and not he have been the actual sufferers and are the real parties in interest." *Jefferson Electric,* 291 U.S. at 402, 54 S.Ct. 443.

We therefore find that competitive or market pricing occurred by admission. When competitive pricing is used, as here, the plaintiff must show that its competitors' price(s), *i.e.,* the market price, did *not* include excise tax. *Tenneco,* 17 Cl.Ct. at 351. No such proof was adduced here; to the contrary, per the following admission, the market price did, in fact, include excise tax, to wit:

> "I don't even really care, really, where I'm sitting at on my costs, because I know for a fact that my neighbor, that's not a duty-free operator, if he's sitting at a dollar thirty, that includes tax. He is liable for tax. He must collect tax."

Levesque Dep. 50:22–25, 51:1–3 (Jan. 17, 2001).

Plaintiff here appears to have spoken for itself, albeit, against its own interest. With that, we end our analysis, as all of the foregoing sufficiently shows that plaintiff has neither carried its burden of proof nor persuasion, by a preponderance of the evidence, respecting any entitlement to receive a payment under § 6421(c), inasmuch as his proof is totally deficient respecting § 6416(a)(1)(A).

Therefore, given the total failure of proof by plaintiff, *supra,* that it did not pass-on the excise tax to its retail customers *vis-a-vis* its

---

**46.** *See also GorDag Industries, Inc. v. United States,* 63–2 U.S. Tax Cas. (CCH) ¶ 15,532 at 90,565, 1963 WL 12684 (D.Minn.1963) ("Uncorroborated testimony by the plaintiff's president, an interested party, is not enough evidence standing alone to prove that the tax was not passed on.").

sales pricing, it is not necessary for us to consider the other factors discussed in *Tenneco*.

### E. Adverse Inference

Finally, in conjunction with the testimony of Mr. Tacoma and Mr. Levesque alluding to record evidence of Ammex's pricing method when none was adduced by plaintiff, an adverse inference may be drawn against plaintiff for failure to produce physical corroborative evidence that is admittedly available and/or would normally be in the sole control of plaintiff.[47] This is particularly true, whereas here plaintiff fails to justifiably explain such failure. Plaintiff kept meticulous records of purchase invoices and sales receipts, but knowing that it must sell tax-free, has no such records and/or workpapers memorializing the calculation of its retail gas prices during the periods at issue. Plaintiff asserted during discovery that it has no records:

> "21. Identify all workpapers, if any, or other documents reflecting the computation or determination of the prices plaintiff charged for gasoline that it sold at its facility at the Ambassador Bridge during the periods in suit.
>
> Response: To the best of Plaintiff's knowledge, after a diligent search, there exist no documents reflecting the computation or determination of the prices Plaintiff charged for gasoline that it sold at its facility at the Ambassador Bridge during the periods in suit."

Def. Ex. 8.

Notwithstanding the categorical denial of the existence of records reflecting retail price computations in Defendant's Exhibit 8, the testimony of both Messrs. Tacoma and Levesque at trial belies the foregoing. Consider the following testimony of Mr. Tacoma who stated that "... we had a running log that we would keep." While in that same connection Mr. Levesque responded to certain questions as follows:

> "Q. Do you have any specific examples ... based on any records?
> A. I don't have any records *with me*.
> Q. Do any such records exist?
> A. It's possible.
> A. I don't have all these records in front of me but it is entirely possible."

Plaintiff argues that defendant has not come forward to rebut its evidence, thereby rendering adverse inference improper. This court is not required to merely take plaintiff at its word. As noted *supra*, there was no proffer by plaintiff to demonstrate/re-create or in any way buttress its evidence for the court using its real pricing situations as an example. Plaintiff's burden of proof is that of a taxpayer claiming a refund—at least by a preponderance of the evidence.

> "It is not unreasonable to expect an experienced [business], as is the plaintiff here, to produce records or analyses of the various factors that were considered in setting a price such as [unit] cost, marketing expense, profit margin and the like. Mere uncorroborated testimonial utterances by the taxpayer, an interested party, are a poor substitute for such evidence."

*Vogel*, 147 F.Supp. at 14.

### V. CONCLUSION

Based upon all of the foregoing, we hold that plaintiff is not eligible for a payment award under 26 U.S.C. §§ 6421(c) and 4221(a)(2), inasmuch as it failed to carry its burden of proof by a preponderance of the evidence respecting 26 U.S.C. § 6416(a).

Therefore, the Clerk shall enter judgment dismissing plaintiff's complaints.

IT IS SO ORDERED.

---

47. *Stelco Holding Co. v. United States*, 42 Fed.Cl. 101, 107–08 n. 14 (1998) ("[U]nder the adverse inference rule, [] '... when a party has relevant evidence within its control and fails to produce such [or to explain such failure], that failure raises the presumption that if in fact produced, it would be unfavorable to its cause.'") (citations omitted); *Cavalier Clothes, Inc. v. United States*, 51 Fed. Cl. 399, 420 n. 28 (2001) (quoting *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610 (1939)) ("'The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. Silence then becomes evidence of the most convincing character.' (citation omitted)").